## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| Favian Busby and Michael Edgington, *on their own behalf and on behalf of those similarly situated*;<br><br>Petitioners-Plaintiffs,<br><br>                v.<br><br>Floyd Bonner, Jr., *in his official capacity*, Shelby County Sheriff, and the Shelby County Sheriff's Office,<br><br>Respondents-Defendants. | Case No. _____<br><br>**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      We are in the midst of the most significant global pandemic in generations. COVID-19 is a highly contagious and deadly respiratory disease caused by a novel coronavirus (SARS-CoV-2).  The death rate of COVID-19 is estimated to be at least 2.3 percent, which is several times more than the common flu that kills thousands a year.[1]  The World Health Organization estimates that one in five people who contract the disease requires hospitalization.[2]

2.      This action seeks urgent habeas and injunctive relief to protect medically vulnerable people and people with disabilities detained at Shelby County Jail[3] (the "Jail") who are at high risk of severe injury or death from COVID-19.  Favian Busby and Michael Edgington (the "Named Plaintiffs") seek to represent a class of all current and future medically vulnerable (as defined below) pretrial detainees held at the Jail who, according to the Centers for Disease Control and Prevention (the "CDC"), are at high risk of severe infection or death from COVID-19 (the "Class").  Named Plaintiffs also seek to represent a subclass of current and future pretrial detainees who are medically vulnerable and at high risk of severe injury or death from COVID-19 due to disabilities protected under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act (the "Subclass").

---

[1]   The University of Tennessee Health Science Center estimates the fatality rate may be as high as 3.4 percent and notes that the novel coronavirus and COVID-19 are "100s of times worse than influenza." *Expert Responses*, University of Tennessee Health Science Center, https://uthsc.edu/coronavirus/expert-responses.php (last visited May 19, 2020).  As of May 17, 2020, there were 4,651,119 confirmed cases globally, with 312,119 deaths and 1,700,354 recoveries.  *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, Johns Hopkins University of Medicine, https://cutt.ly/StEyn2U; *see also Coronavirus disease 2019 (COVID-19)*, UpToDate, https://cutt.ly/GtJYSkj (as of May 15, 2020, estimated overall fatality rate of 2.3 percent globally).

[2]   *Q&A on Coronaviruses (COVID-19)*, *"Should I Worry About COVID-19?*," World Health Organization, https://cutt.ly/YtEyrxl (last visited May 19, 2020).

[3]   For the purposes of this motion, "Shelby County Jail" or the "Jail" refers to the detention facility located at 201 Poplar Ave., Memphis, TN 38103.

3.     COVID-19 has already spread throughout the Jail, infecting hundreds of people, yet Defendants continue to detain the members of the Class and Subclass (collectively, the "Classes") despite the fact that they are likely to suffer severe infection or death if they contract COVID-19 and despite the Petitioners-Plaintiffs' ("Plaintiffs") high risk of contracting the disease by virtue of their housing at the Jail.  Accordingly, Plaintiffs seek emergency relief from this Court provisionally certifying the Class and Subclass and compelling Defendants to (a) release[4] immediately Favian Busby and Michael Edgington; (b) promptly identify COVID vulnerable individuals held at the Jail who are members of the Class; and (c) promptly release members of the Class from detention.

## JURISDICTION AND VENUE

4.     Plaintiffs bring this putative class action pursuant to 28 U.S.C. § 2241 and for relief from both detention that violates their Fourteenth Amendment rights under the U.S. Constitution and pursuant to 42 U.S.C. § 12131 *et seq.* and 29 U.S.C. § 794 for relief from disability discrimination.

5.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction) and Article I, Section 9, clause 2 of the U.S. Constitution (the Suspension Clause).

---

[4]    The term "release," as used throughout this Petition, refers to the discharge of detained individuals from the physical confines of the Shelby County Jail, not necessarily release from all forms of custody.  Release options may include, but are not limited to: supervised release (including through the use of GPS or other forms of location monitoring), halfway house residential placement, transfer to a hospital or other facility, or diversion to alternative community and treatment programs.  Indeed, Shelby County already maintains a Pretrial Services Department "offering alternatives to incarceration at every stage of the criminal justice system."  *See* Shelby Cty. Tenn., Pretrial Services, available at https://www.shelbycountytn.gov/250/Justice-Initiatives (last visited May 20, 2020).

6.      Venue lies in the U.S. District Court for the Western District of Tennessee, the judicial district in which Plaintiffs are currently in custody.  Venue is proper in the Western District of Tennessee under 28 U.S.C. § 1391, as venue is proper in any district in which a defendant resides.

## PARTIES

7.      Michael Edgington is a pretrial detainee at Shelby County Jail.  He is 60 years old, putting him at high risk of serious illness or death if he contracts COVID-19.

8.      Favian Busby is a pretrial detainee at Shelby County Jail.  He has diabetes and takes insulin.  Additionally, he has developed hypertension as a result of his diabetes.  These conditions put him at high risk of serious illness or death if he contracts COVID-19.

9.      Respondent-Defendant Floyd Bonner, Jr. is the Sheriff of Shelby County, Tennessee and may be served with process at 201 Poplar Avenue, 9th Floor, Memphis, Tennessee 38103.  Defendant Bonner is named in this action in his official capacity as the Sheriff of Shelby County.

10.      Respondent-Defendant Shelby County Sheriff's Department is a Tennessee governmental department which, by virtue of its custody of Plaintiffs, is a party defendant to this matter.  Defendant Shelby County Sheriff's Department may be served with process by serving Sheriff Floyd Bonner, Jr.

**FACTS**

**A. Plaintiffs and the Class Members are at High Risk of Severe Injury or Death from COVID-19.**

11.     COVID-19 is an extremely infectious and deadly disease that is transmitted from person to person.  The University of Tennessee Health Science Center indicates COVID-19 may be hundreds of times more fatal than influenza.[5]

12.     On March 12, 2020, Governor Bill Lee declared a state of emergency in Tennessee in response to COVID-19.  The Tennessee Department of Health notes that as of May 19, 2020, 18,378 Tennesseans have been infected with COVID-19, with 1,498 hospitalizations and 305 deaths.  The highest number of deaths to date have occurred in Shelby County, which has the second highest number of cases.

13.     As of May 20, 2020, at least 4,761,559 people worldwide have tested positive for the virus, and 317,559 people have died.[6]   In the United States, at least 1,504,830 people have contracted the virus, and at least 90,340 people have died from it.[7]  Early data suggests COVID-19's mortality rate in the U.S. is 1.3 percent, and as high as 3.6 percent in some counties.[8]

14.     COVID-19 can cause grave injury to the lungs and heart, causing myocarditis, or inflammation of the heart muscle.  COVID-19 can also result in permanent injury to the kidneys.

---

[5]     University of Tennessee Health Science Center, *supra* note 1.
[6]     *Coronavirus disease (COVID-19) pandemic*, World Health Organization https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited May 20, 2020).
[7]     *Cases in the U.S.,* Centers for Disease Control and Prevention https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 20, 2020).
[8]     Anirban Basu, *Estimating The Infection Fatality Rate Among Symptomatic COVID-19 Cases In The United States*, Health Affairs (May 7, 2020) https://www.healthaffairs.org/doi/10.1377/hlthaff.2020.00455.

15.     Patients who experience severe infections from COVID-19 require supportive care, including recourse to scarce medical equipment and specialized care providers, who are able to monitor and implement the care these individuals require.  This level of support can exceed local health-care resources.

16.     Patients who survive severe COVID-19 infections often require extensive rehabilitation to mitigate neurologic damage and the loss of respiratory capacity.  Many who suffer from severe infections will likely experience lifelong limitations and disabilities.

17.     Age is a significant risk factor for complications and death.  The mortality rate is at least 1-3 percent for those over 55, and less than 1 percent for those under 55.[9]  Certain underlying medical conditions and disabilities increase the risk of complications or death from COVID-19 regardless of age.[10]  The University of Tennessee Health Science Center notes that medically

---

[9]     *Severe Outcomes Among Patients With COVID-19*, Centers for Disease Control and Prevention (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm.

[10]    Known conditions associated with a heightened risk of mortality and complications from COVID-19 include, but are not limited to: blood disorders, such as sickle cell disease or the use of blood thinners; chronic kidney disease; chronic liver disease, including cirrhosis and chronic hepatitis; cancer or cancer treatments; organ or bone marrow transplant; the use of immunosuppressant medications; HIV or AIDS; diabetes; inherited metabolic disorders and mitochondrial disorders; heart disease, including coronary artery disease, congenital heart disease, and heart failure; lung disease, including asthma and COPD (chronic bronchitis or emphysema); neurological and neurologic development conditions such as cerebral palsy, stroke, muscular dystrophy, or spinal cord injury; severe obesity (which is defined as having a BMI of 40 or higher); intellectual or developmental disability that may inhibit a person's ability to understand or act on prevention measures or communicate symptoms, and any other condition or treatment that weakens immune response.  *See* Harvard Medical School, *If you are at higher risk: How to reduce risk of infection and what to do if you get sick*, Harvard Health Publishing (updated May 6, 2020), https://www.health.harvard.edu/diseases-and-conditions/if-you-are-at-higher-risk; *see also High-Risk Conditions,* Centers For Disease Control And Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (last visited May 16, 2020); University of Tennessee Health Science Center, *supra* note 1 ("The elderly, persons with chronic respiratory or cardiac diseases, pregnant women, and immunocompromised persons are at high risk for poor outcomes from COVID-19.").

vulnerable persons—those who are likely to suffer worse outcomes if they were to contract COVID-19—may well need to "stay at home as much as possible" because "the only current advice is to avoid others who might be sick."[11]

18.     According to the CDC, African Americans are at increased risk for the kinds of medical conditions and disabilities that increase the risk of serious illness or death from COVID-19.  The rate of diabetes is 60 percent higher in African Americans than in Caucasian Americans;[12] the rate of hypertension is 40 percent higher.[13]   Recent analysis of CDC data shows that the COVID-19 mortality rate among African Americans is 2.6 times that of white Americans.[14]   On any given day, the population of the Jail is more than 86 percent African American.[15]   Both the Named Plaintiffs are African American.

**B.   Plaintiffs and the Class Members are Likely to Contract COVID-19 Unless They Are Released.**

19.     Experts agree that COVID-19 is primarily spread through respiratory droplets that are inhaled by people nearby.  Asymptomatic carriers of COVID-19 can also transmit it; public health officials estimate that as many as half of all transmitted cases pass from an infected person

---

[11]   University of Tennessee Health Science Center, *supra* note 1.

[12]   U.S. Department of Health and Human Services, Office of Minority Health, Diabetes and African Americans (accessed May 18, 2020), https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=4&lvlid=18.

[13]   U.S. Department of Health and Human Services, Office of Minority Health, Heart Disease and African Americans (accessed May 18, 2020), https://minorityhealth.hhs.gov/omh/browse.aspx?lvl=4&lvlid=19.

[14]   APM Research Lab Staff, *Covid-19 Deaths by Races and Ethnicity in the U.S.*, APM Research Lab (May 12, 2020), https://www.apmresearchlab.org/covid/deaths-by-race.

[15]   MacArthur Foundation, Safety + Justice Challenge, "Shelby County, TN," http://www.safetyandjusticechallenge.org/challenge-site/shelby-county/ (last visited May 20, 2020)

with few or no symptoms.[16]  Experts at the University of Tennessee Health Science Center stress that people infected with COVID-19 may be infectious for upwards of 2–3 weeks, though any symptoms they experience last for far less time.[17]

20.     There is no vaccine or cure for COVID-19.  The only known way in which to mitigate the risk of contracting COVID-19 is to maintain at least six feet of distance from other people, and to practice vigilant hygiene, including frequent hand-washing, wearing face masks and gloves, and frequently sanitizing high-touch surfaces.[18]  Experts at the University of Tennessee Health Science Center note in particular that social distancing and rigorous hygiene are the "best prevention" and "better than even an N95 mask."[19]

21.     Accordingly, Governor Lee has required all Tennesseans who leave their homes to adhere to social distancing measures recommended by the CDC.  Similarly, the Shelby County Health Department has advised all businesses to require that their employees and customers wear face masks and keep six feet from one another.[20]

22.     Because it is impossible to practice social distancing in prisons and jails, and because these facilities are not sanitized on a daily basis and hygiene is generally lacking, prisons

---

[16]  Nathan W. Furukawa, et al., *Evidence supporting transmission of severe acute respiratory syndrome coronavirus 2 while presymptomatic or asymptomatic*, Emerg Infect Dis. (July 2020 online report) (accessed May 14, 2020), https://doi.org/10.3201/eid2607.201595.

[17]  University of Tennessee Health Science Center, *supra* note 1.

[18]  *Id*. ("The only current advice is to avoid others who might be sick and wash your hands frequently and before touching your face," and "The best way to prevent infection is not to go near someone who is sick with the disease.... If you are in areas with active disease outbreaks, then the best measures are to stay at least 6 feet away from anyone with symptoms, avoid close contact such as shaking hands, and practice frequent hand hygiene.").

[19]  *Id.*

[20]  Lee Harris, Bruce Randolph and Alisa Haushalter, *Formal Issuance of Health Directive No. 3*, Shelby County Health Department (May 4, 2020), http://www.shelbytnhealth.com/CivicAlerts.aspx?AID=73.

and jails across the country have become epicenters for COVID-19,[21] including in Tennessee. In addition to causing significant harm to those incarcerated, rampant outbreaks of COVID-19 in jails become the direct cause of additional infections, hospitalizations, and deaths among jail staff and the surrounding community in which a jail sits.[22]

23.     Across the country, governments and jail staff have recognized the threat that COVID-19 poses to incarcerated people and the surrounding community.  Jail administrators in numerous states, including Alabama, California, Colorado, Ohio, and New Jersey, have concluded that widespread jail release is a necessary and appropriate public health intervention.[23]

24.     Courts have intervened across the country to release COVID-vulnerable detainees who are at high risk of severe infection or death from the disease.  *See, e.g.*, *Wilson* v. *Williams,* No. 4:20-cv-00794, 2020 WL 1940882 (N.D. Ohio, Apr. 22, 2020) (ordering removal of all medically vulnerable prisoners from a federal prison with a COVID-19 outbreak); *Martinez-Brooks* v. *Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350 (D. Conn. May 12, 2020) (ordering identification of medically vulnerable detainees, their sentencing information, their

---

[21]  *See, e.g.*, Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html; Sonia Moghe, *Inside New York's notorious Rikers Island jails, 'the epicenter of the epicenter' of the coronavirus pandemic*, CNN (May 16, 2020), https://www.cnn.com/2020/05/16/us/rikers-coronavirus/index.html; Katie Park et al., *Tracking the Spread of Coronavirus in Prisons*, The Marshall Project (Apr. 24, 2020), https://www.themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons; Lauren-Brooke Eisen, *COVID-19 Continues its Toll on Jails and Prisons*, Brennan Center (May 4, 2020) (interview with Dr. Homer Venters, former Chief Medical Officer of New York City Correctional Health System).

[22]  Eric Lofgren, et al., *The Epidemiological Implications of Incarceration Dynamics in Jails for Community, Corrections Officer, and Incarcerated Population Risks from COVID-19*, MEDRXIV (May 4, 2020), https://www.medrxiv.org/content/10.1101/2020.04.08.20058842v2.

[23]  Prison Policy Initiative, Responses to the COVID-19 pandemic (last updated May 19, 2020), https://www.prisonpolicy.org/virus/virusresponse.html#releases.

consideration for compassionate release or home confinement, implementation of a process to make full and speedy use of home confinement, and requiring elimination of certain barriers to consideration for release or transfer).[24]  This includes decisions providing for the release of all medically vulnerable prisoners (or at least those not presenting special concerns of flight or dangerousness).[25]

25. Across Tennessee, positive tests in correctional facilities continue to rise.[26]  As reported on April 17, 2020, 23 pretrial detainees at the Jail were tested; five were positive for COVID-19.[27]  The Jail tested 266 pretrial detainees and employees on or about April 25th, and as reported on April 29th, seventy-two percent tested positive.[28]  In data released on May 15, 151 pretrial detainees and 66 jail staff tested positive for COVID-19; publicly-available data does not yet show how many were tested in arriving at these numbers.[29]  The true numbers in the Jail are

---

[24] *See also Malam* v. *Adducci*, No. 5:20-cv-10829, ECF. 22, 29 (E.D. Mich. Apr. 5, 2020, Apr. 9, 2020) (ordering release of two detainees in Michigan at high risk for serious illness due to their age and underlying health conditions); *Cameron* v. *Bouchard*, No. 20-10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020).

[25] Many courts have also ordered compassionate release or release based on time served in light of the dangers of COVID-19. *See, e.g.*, *United States* v. *Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States* v. *Hansen*, No. 17 CR 50062, 2020 WL 2219068 (N.D. Ill. May 7, 2020).

[26] *A State-by-State Look at Coronavirus in Prisons*, The Marshall Project (last updated May 8, 2020) https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.

[27] Yolanda Jones, *Five Inmates Test Positive for COVID at Shelby County Jail as Bonner Takes Safety Precautions*, DAILY MEMPHIAN (Apr. 17, 2020) https://dailymemphian.com/article/13074/sheriff-floyd-bonner-five-inmates-positive-coronavirus-shelby-county-jail.

[28] Yolanda Jones, *More Than 70% Of Inmates Tested At 201 Poplar Are Positive For COVID-19*, DAILY MEMPHIAN (Apr. 29, 2020) https://dailymemphian.com/article/13488/201-poplar-covid-testing-70-percent-positive.

[29] Yolanda Jones, *West Tennessee Prisons, Shelby County Jail Hit Hard by Coronavirus*, Daily Memphian (May 18, 2020), https://dailymemphian.com/article/14121/tennessee-department-of-correction-shelby-county-jail-covid-19-testing-positive.

undoubtedly higher, as the Jail has not administered universal testing.  To date, one Shelby County

Jail employee has died from COVID-19.[30]

26.     Dr. Joe Goldenson, a physician with over 33 years of experience in correctional

health care, has explained that conditions at jails prohibit social distancing and "exacerbate the

spread of infectious diseases, particularly diseases like COVID-19."  Likewise, Dr. Virginia

Fefferman has explained, "[t]he living conditions within the jail spread disease.  Incarcerated

people cannot practice social distancing due to the lack of space, overcrowding, or the requirement

of constant supervision.  Incarcerated people are moved in groups from jail to court or, where court

proceedings are halted due to this pandemic, forced to remain in their cells or dorms in close

proximity to each other.  Incarcerated people often have limited access to products and equipment

necessary to practice good personal hygiene, such as soap, or hand sanitizer or cleaning products."

27.     As a result, Dr. Goldenson believes that "medically vulnerable persons at Shelby

County Jail are at grave risk of death or serious illness" and "must be released as soon as possible."

Likewise, Dr. Fefferman has cautioned that "[e]ach additional day the jail system continues under

current operational standards will cost lives in both the incarcerated population and the broader

community each jail serves."

**C.  The Class Members Are Unsafe and Their Rights Are Being Violated.**

28.     At the Jail, the Named Plaintiffs live in "pods" with cells lining an open communal

area.  Every cell has at least one person, and most have two people.

29.     When more than one person is in a cell, it is impossible to maintain a six-foot

distance from one another.  Detainees report spending up to 30 to 48 hours at a time in the same

cell with another person.  Class members sleep in bunk beds, with one bed three to four feet

---

[30]   Yolanda Jones, *Sheriff's Office Employee Dies From COVID-19,* DAILY MEMPHIAN (Apr. 21, 2020)
https://dailymemphian.com/article/13185/sheriffs-office-employee-dies-from-covid-19.

another.  Each cell also has an open toilet area and a sink that is shared by both cellmates.  Showers are in the communal area of the pod and are shared by all members of the pod.

30.     During mealtime, detainees are required to line up inches apart from each other to receive their meal trays from other detainees who distribute meals as part of their work duties. Detainees then sit four men to a table—sometimes squeezing in five or six men if there is not enough available seating—to eat their meal.  It is not possible to socially distance in the communal area.  People detained in the Jail were provided one mask on or around April 22, 2020.  Most of those who received the masks have not been able to receive replacements.  Detainees use the same metal utensils and cup for each meal and are responsible for maintaining their own utensils and cups.  They do not have access to a dishwasher or bleach for cleaning their utensils.

31.     Class members must also use, and reuse, the same "high-touch" items, such as telephones and kiosks, and the Jail does not provide disinfectant or other cleaning supplies to sanitize these items.  The Jail gives Class members a clean change of clothes only once a week. Class members must purchase soap from commissary, and if they cannot afford commissary soap they must wait several days to get free soap.  The soap available for free is small, and only lasts three or four days.  Class members are only rarely able to clean their cells, relying on staff to offer cleaning supplies.  Even when cleaning spray is available, Class members must use unwashed towels to wipe down surfaces.  There is no hand sanitizer available to any Class members.

32.     The Jail does not test for COVID-19 upon the intake of new arrestees.  If someone displays symptoms of COVID-19, he is still booked into the Jail but is escorted to an isolation pod. Because the Jail relies on reported symptoms to decide whom to quarantine, there is no system for

preventing spread of COVID-19 among asymptomatic people, even though many infected with COVID-19 may be asymptomatic while still capable of infecting others.[31]

33.     On April 29, 2020, staff at the Jail pepper-sprayed detainees in medical isolation for COVID-19.   This exacerbated the difficulty of breathing for many persons already experiencing symptoms including shortness of breath, nausea, vomiting, coughing up blood, fevers, and chills.

34.     On May 19, 2020, staff at the Jail forced detainees who had been in quarantine for having contracted or been exposed to COVID-19 back into the general population.  Those being moved from medical isolation were not retested for COVID-19 prior to being moved, nor were they screened for symptoms of COVID-19.  Many detainees resisted the move because it put other people in the Jail at risk of increased exposure to the virus: as one person in quarantined housing put it, "All we are looking for is to be re-tested before we are re-classified and rehoused. . . [I feel] a moral obligation" not to pass the virus to anyone else.[32] Jail staff pepper sprayed those individuals who refused to move out of quarantine.

## D. Respondent-Defendants Have Discriminated against the Members of the Subclass in Violation of the ADA and the Rehabilitation Act.

35.     Respondent-Defendants' actions violate not only Class members' constitutional rights, but also the Subclass members' rights under disability rights laws.  The Jail has failed, and continues to fail, to make reasonable modifications to detention to ensure that people with disabilities have an equal opportunity to participate in the adjudication of their criminal cases and to access jail services.  For example, the Jail has failed to make modifications to ensure that

---

[31]   *See* Furukawa, *supra* note 14.

[32]   Yolanda Jones, *Inmates at 201 Poplar pepper-sprayed over move after COVID quarantine*, DAILY MEMPHIAN (May 19, 2020) https://dailymemphian.com/article/14169/covid-19-201-poplar-anthony-buckner-shelby-county-sheriffs-office.

members of the Subclass can practice adequate social distancing, and has failed to implement a system for release as a modification to ensure Subclass members are alive to participate in the adjudication of their cases.

36.     By continuing to detain Plaintiffs with disabilities, Defendants' policies and practices violate the ADA and the Rehabilitation Act.

37.     Plaintiff Favian Busby has been diagnosed with diabetes and hypertension, for which he takes medication daily.  He also recently had surgery to implant a new joint between his femur and hip, from which he is still recovering.  These conditions put Mr. Busby at high risk of severe infection or death from COVID-19.

38.     Four men in Mr. Busby's pod tested positive for COVID-19 on April 24.  It is not possible for Mr. Busby to socially distance in his pod.  To use a phone or obtain medication, Mr. Busby must wait in crowded lines.  Staff do not socially distance and often do not wear masks, and Mr. Busby has not seen them wash their hands or use hand sanitizer.

39.     He has also seen other people in the pod with COVID-19 symptoms who have avoided testing for fear of being put in isolation.  Staff also do not always follow quarantine procedures.  Mr. Busby has seen people go into quarantine, return to the pod, exhibit symptoms again, and yet not be sent back into quarantine.

## CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals consisting of all pretrial detainees in the custody of the Jail who are medically vulnerable (the "Class").

41.     The Class is defined as follows: all current and future persons held at the Jail in pretrial custody during the coronavirus pandemic who are aged 55 and older, as well as all current and future persons held at the Jail of any age who have: (a) lung disease, including asthma, chronic

obstructive pulmonary disease (*e.g.*, bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) hypertension; (f) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (g) blood disorders (including sickle cell disease); (h) inherited metabolic disorders; (i) history of stroke; (j) neurological or developmental disability; (k) cancer or cancer treatments; (l) a BMI of 40 or more; and/or (m) muscular dystrophy or spinal cord injury.

42.    Favian Busby also seeks to represent a subclass, consisting of all current and future pretrial detainees in custody at the Jail who are medically vulnerable because of a disability as defined in the ADA (the "Subclass").  The Subclass includes people with all conditions listed in paragraph 42, except those who are medically vulnerable solely because of age or BMI.

43.    This action has been brought and may properly be maintained as a class action under federal law.  It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

44.    Joinder is impracticable because (1) the Classes are numerous; (2) the Classes include future members, and (3) the Class members are incarcerated, rendering their ability to institute individual lawsuits limited, particularly in light of reduced legal visitation and court closures in Shelby County.

45.   <u>Numerosity</u>:   On information and belief, there are at least 300 people in the proposed Class and Subclass.  First, there are currently over 200 people over 55 years old detained at the Jail.[33]  People in jails have higher rates of chronic health conditions than people in the general population.  According to the Bureau of Justice Statistics, it is estimated that 39.8 percent of people in jail have a chronic health condition.[34]  Virtually all of these people will be members of the Class and Subclass.  Further, as the below chart illustrates, health conditions that make COVID-19 particularly dangerous are more prevalent in the incarcerated population than in the general public.[35]

| Health condition | Prevalence of health condition by population | | | |
| --- | --- | --- | --- | --- |
| | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

46.   Specific information regarding the size of the Class and the Subclass, as well as the identity of the members of each group, is in Defendants' exclusive control.

---

[33]   *See* Shelby Cty. Sheriff's Office, Who's In Jail, *available at* http://www.shelbysheriff.org/injail.html (last visited May 18, 2020).

[34]   *See* Laura M. Maruschack et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, p. 21, U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics (Feb. 2015), *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[35]   Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform*, Prison Policy Initiative (Mar. 6, 2020), https://cutt.ly/7tJXmlC.

47.   <u>Commonality</u>:  Common questions of law and fact exist as to all members of the proposed Class and Subclass, including: (a) whether Defendants are detaining the members of the Class in violation of their constitutional rights; (b) whether Defendants' policies and practices discriminate against the members of the Subclass in violation of the ADA and the Rehabilitation Act; and (c) whether Defendants are implementing policies and procedures to ensure social distancing, and to provide adequate PPE, or otherwise following CDC guidance to protect Class members.

48.   <u>Typicality</u>:  The claims of the Named Plaintiffs are typical of those of the Class as a whole, including because (a) each Named Plaintiff is currently in Defendants' custody and (b) the Named Plaintiffs' and all of the Class members' claims arise from the same wrongful acts, omissions, policies, and practices of Defendants, and are based on the same legal theories.

49.   <u>Adequacy</u>:  The Named Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the Class.  The Named Plaintiffs have no interests adverse to the interests of the proposed Class.  The Named Plaintiffs retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation. Counsel for the Named Plaintiffs know of no conflicts among proposed Class members or between counsel and proposed Class members.

50.   Defendants have acted on grounds generally applicable to all proposed Class members.  This action seeks declaratory and injunctive relief.  Plaintiffs therefore seek Class certification under Rule 23(b)(2).

51.   In the alternative, the requirements of Rule 23(b)(1) are satisfied because prosecuting separate actions would create a risk of inconsistent or varying adjudications with

respect to individual Class members that would establish incompatible standards for the party opposing the proposed Class.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Unconstitutional Punishment in Violation of the Fourteenth Amendment to the U.S. Constitution**
28 U.S.C. § 2241
*The Class Against All Defendants*

52.    Plaintiffs repeat and re-allege each and every allegation above, as if set forth in full herein.

53.    Under the Fourteenth Amendment, persons in pretrial custody cannot be punished as part of their detention. *Bell* v. *Wolfish*, 441 U.S. 520, 535 n.16 (1979). Punishment is established if the jailer's conduct is either not rationally related to a legitimate, non-punitive government purpose or excessive in relation to that purpose.

54.    Under general circumstances, Defendants can hold pretrial detainees if, after making individualized findings based on the person's flight risk and danger to the community, and evaluating less restrictive options than jail, it is clear that nothing short of detention will mitigate a credible risk of flight or danger. But and as a condition of holding persons in pretrial custody, the Jail must provide them with health care services and a safe environment, and cannot punish them. Here, Defendants have exposed the Named Plaintiffs and the Class members to high risk of severe infection or death from COVID-19. Continuing to detain the Named Plaintiffs and the Class members is punitive, not rationally related to a legitimate purpose, and/or excessive in relation to any legitimate purpose.

55.    Accordingly, Defendants, as supervisors, direct participants, and policy makers for Shelby County, have violated the rights of the Named Plaintiffs and the Class members under the Fourteenth Amendment.

18

<u>SECOND CLAIM FOR RELIEF</u>
**Unconstitutional Confinement in Violation of the**
**Fourteenth Amendment to the U.S. Constitution**
28 U.S.C. § 2241
*The Class Against All Defendants*

56.    Plaintiffs repeat and re-allege each and every allegation above, as if set forth in full herein.

57.    Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody.  *Youngberg* v. *Romeo*, 457 U.S. 307, 315–16, 324 (1982) (the state has an "unquestioned duty" to provide adequate medical care for detained persons).

58.    Corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody, including risks of future harm to their health and safety.  *See Helling* v. *McKinney*, 509 U.S. 25, 33–34 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition. . . . [i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them").

59.    Under the Fourteenth Amendment, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail to at least the same degree of persons in custody subsequent to a conviction, if not to a higher degree.  Deliberate indifference to the serious risk COVID-19 poses to members of the Class violates this right.

60.    Named Plaintiffs and the members of the Class are at high risk of severe infection from COVID-19.  The Jail is rife with confirmed cases of COVID-19.  Named Plaintiffs and Class members, because of their medical conditions and COVID-vulnerability, cannot be safe in the dorm-style facilities in which they are housed at the Jail.  The only way to ensure their safety and

protect their constitutional rights is through release.  Defendants are aware of the risk to the safety of the Named Plaintiffs and the Class members, but they have not taken steps to release them. Defendants are therefore deliberately indifferent to the safety of the Named Plaintiffs and the Class members.

61.     Accordingly, Defendants have violated the rights of the Named Plaintiffs and the Class members under the Fourteenth Amendment.

**THIRD CLAIM FOR RELIEF**
**Discrimination on the Basis of Disability in Violation of Title II of the ADA**
42 U.S.C. § 12131, *et seq.*/ 28 U.S.C. § 2241
*The Subclass Against All Defendants*

62.     Plaintiffs repeat and re-allege each and every allegation above, as if set forth in full herein.

63.     Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of disability.  42 U.S.C. § 12132.  The regulations implementing Title II of the ADA require that public entities avoid policies, practices, criteria, or methods of administration that have the effect of excluding or discriminating against persons with disabilities in the entity's programs, services, or activities.  28 C.F.R. § 35.130(a), (b)((3), (8).  Further, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

64.     Members of the Subclass are individuals with disabilities for purposes of the ADA. 42 U.S.C. § 12102.  They are "qualified" for the programs, services, and activities being challenged herein.  42 U.S.C. § 12131(2).

65.     Defendants are violating Title II of the ADA by failing to make the reasonable modifications necessary to ensure equal access to adjudication, jail services, and release for people with disabilities who face high risk of severe infection or death from COVID-19.  Defendants are further violating the ADA by employing methods of administration (including a policy of non-release even in the face of the dangers of COVID-19) that tend to discriminate against people with disabilities.

### FOURTH CLAIM FOR RELIEF
**Discrimination on the Basis of Disability in Violation
of Section 504 of the Rehabilitation Act**
29 U.S.C. § 794/28 U.S.C. § 2241
*The Subclass Against All Defendants*

66.     Plaintiffs repeat and re-allege each and every allegation above, as if set forth in full herein.

67.     Section 504 of the Rehabilitation Act states that "no qualified individual with disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices, criteria, or methods of administration that have the effect of discriminating against persons with disabilities.  28 C.F.R. § 41.51(b)(3)(i).

68.     Defendants receive "Federal financial assistance" within the meaning of 28 U.S.C. § 794(a).

69.     Favian Busby is an individual with disabilities for the purposes of the Rehabilitation Act, 42 U.S.C. § 12012, 29 U.S.C. § 705(20)(B).  He is "qualified" for the programs, services, and activities being challenged herein.

70.     Defendants are violating Section 504 of the Rehabilitation Act by failing to make the reasonable modifications necessary to ensure equal access to adjudication, jail services, and release for people with disabilities who are at high risk of severe infection or death from COVID-19.   Defendants are further violating the Rehabilitation Act by employing methods of administration (including a policy of non-release even in the face of the dangers of COVID-19) that tend to discriminate against people with disabilities.

## REQUEST FOR RELIEF

71.     The Named Plaintiffs and Class members respectfully request that the Court enter an Order:

1.      certifying this Petition as a Class Action;

2.      granting a temporary restraining order and/or writ of habeas corpus requiring Defendants to release immediately all Named Plaintiffs;

3.      granting a temporary restraining order and/or writ of habeas corpus requiring Defendants to produce promptly a list of all other Class and Subclass members detained at the Jail:

4.      granting a temporary restraining order and/or writ of habeas corpus and/or order an enlargement of custody for all members of the Class and Subclass incarcerated solely due to their inability to afford a financial condition of release, solely due to an alleged technical violation of probation or parole, or whose release Defendants do not object to;

5.      granting a temporary restraining order, preliminary and permanent injunction, and/or writ of habeas corpus imposing a process—to be determined by the Court— to consider the habeas corpus release and/or enlargement of custody of all

remaining Class and Subclass members not released pursuant to Paragraph 4 within two weeks, considering:

    i.    the deprivation of the petitioner's federal rights posed by the COVID-19 outbreak (including the disability discrimination for Subclass members and the necessity of providing modifications including release);

    ii.    any competent evidence that the individual poses a serious risk of flight or danger to others;

    iii.    whether, by clear and convincing evidence, any present risk of flight of danger outweighs the threat to the petitioner's health and safety posed by his exposure to COVID-19 in the Jail, after considering alternative conditions to manage the risk(s) presented;

6.    granting a preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring continued reporting as to the future members of the Class and Subclass, and requiring Defendants to divert Class and Subclass members from incarceration at the Shelby County Jail, including but not limited to by exercising their authority under T.C.A. 40-7-120;

7.    providing that, if immediate relief is not granted on the basis of this Petition alone, then expedited review of the Petition pursuant to 28 U.S.C. § 2243, including oral argument, via telephonic or videoconference if necessary;

8.    declaring that the Jail's policies violate the Fourteenth Amendment right against cruel and unusual punishment with respect to the Class;

9.    declaring that the Jail's policies violate the Fourteenth Amendment right to be free from punishment prior to conviction with respect to the Class;

10.     declaring that the Jail's policies violate the ADA and Rehabilitation Act with respect to the Subclass;

11.     awarding Named Plaintiffs' attorney fees and costs under 42 U.S.C. sec. 1988 and other applicable law; and

Any further relief this Court deems appropriate.

Dated:   May 20, 2020

Respectfully submitted,

/s/ *Brice M. Timmons*

Brice M. Timmons (Bar No. 29582)
Black McLaren Jones Ryland & Griffee,
A Professional Corporation
530 Oak Court Dr. Suite 360
Memphis, TN 38117
Telephone: (901) 762-0535
Facsimile: (901) 762-0527
btimmons@blackmclaw.com

Josh Spickler (Bar No. 021019)
Wesley Dozier (Bar No. 037735)
Just City
P.O. Box 41852
Memphis, TN 38174
Telephone: (901) 206-2226
josh@justcity.org

Steven John Mulroy (Bar No. 28831)
Bredesen Professor of Law
Cecil C. Humphreys School of Law,
University of Memphis
1 N. Front St.
Memphis, TN 38103
Telephone: (901) 603-8779
smulroy@memphis.edu

Andrea Woods*
Amreeta S. Mathai*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
awoods@aclu.org
amathai@aclu.org

Zoe Brennan-Krohn*
American Civil Liberties Union
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0769
zbrennan-krohn@aclu.org

Maria Morris*
American Civil Liberties Union
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6607
mmorris@aclu.org

Thomas H. Castelli (Bar No. 24849)
Stella Yarbrough (Bar No. 33637)
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Telephone: (615) 320-7142
tcastelli@aclu-tn.org
syarbrough@aclu-tn.org

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Joseph Bial*
2001 K Street NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300
Fascimile: (202) 223-7420
jbial@paulweiss.com

Darren Johnson*
Jonathan M. Silberstein-Loeb*
David Kimball-Stanley*
Adrienne Lee*
Avery Medjuck*
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fascimile: (212) 757-3990
djohnson@paulweiss.com
jsilberstein-loeb@paulweiss.com
dkimball-stanley@paulweiss.com
alee@paulweiss.com
amedjuck@paulweiss.com


*Attorneys for Plaintiffs*
* Application for admission *pro hac vice*
forthcoming