SABOT
C O N S U L T I N G

SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

# Covid-19 Inspection of the Shelby County Men's Jail at 201 Poplar Avenue, Memphis TN 38103

## Final Report

**Submitted to**:

The Honorable Sheryl H. Lipman
District Judge
United States District Court
Western District of Tennessee
Western Division

**Produced by**:
Mike Brady
Director
Sabot Consulting

June 29, 2020



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

THE JAIL SETTING ........................................................................................... 4

INSPECTION OBSERVATIONS - JUNE 23, 24, 25, 2020 ...................................... 5

COVID-19 SCREENING FOR EMPLOYEES ........................................................ 6

INTAKE/BOOKING/RELEASE ............................................................................. 8

MEDICAL ........................................................................................................ 10

MENTAL HEALTH ............................................................................................ 11

MEDICAL ISOLATION LOWER LEVEL PODS A-K ........................................... 13

FLOORS 1-6 ..................................................................................................... 15

POPULATION MANAGEMENT .......................................................................... 17

STAFFING SHORTAGES ................................................................................... 18

FINDINGS AND RECOMMENDATIONS ............................................................. 19

CONCLUSION .................................................................................................. 27

EXHIBIT 1 – INSPECTION ORDER .................................................................. 30



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## INTRODUCTION

My name is Michael K. Brady, and I am the Director of the Criminal Justice Division for Sabot Consulting. I am a nationally recognized expert in prison and jail operations, the Americans With Disabilities Act, and the prevention and mitigation of the spread of infectious diseases and public health in the correctional setting from an operational and non-clinical perspective.

On June 18, 2020, in the matter of Busby V Bonner ( No. 2:20-cv-2359-SHL),  pursuant to Federal Rule of Evidence 706, United States District Judge For The Western District of Tennessee, Western Division, The Honorable  Sheryl H. Lippman, appointed me as the neutral  expert  witness  in  the  field  of  jail  and  prison  operations  as  it  relates  to  the prevention and mitigation of the spread of infectious diseases and public health in the correctional setting.

The Inspection Order states in pertinent part:

> **"…The appointed expert shall provide information to the Court responsive to Plaintiffs' Motion for Temporary Restraining Order (ECF No. 2) and render an expert opinion on the current health and safety of medically-vulnerable Plaintiff-detainees at the Shelby County Jail ("the jail") in light of the Covd-19 pandemic, including but not limited to the Facility's compliance with the pertinent CDC and Shelby County Public Health guidelines and other applicable standards. The expert's findings shall include, if warranted, recommendations regarding corrective measures that, in his expert opinion, should be implemented at the jail, to protect the medically-vulnerable from the COVID-19 virus at the facility…."  (See Inspection Order Filed On June 18, 2020, attached as Exhibit 1)**

The medically-vulnerable detainees to which the inspection order applies are defined as follows:

1. People 65 years and older
2. People with chronic lung disease or moderate to severe asthma (including chronic obstructive pulmonary disease (COPD) (including emphysema, and chronic bronchitis),
3. Idiopathic pulmonary fibrosis and cystic fibrosis;
4. People who have serious heart conditions (including heart failure, coronary heart disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension);
5. People who are immunocompromised (including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications);
6. People with severe obesity (body mass index [BMI] of 40 or higher);
7. People with Diabetes;
8. People with chronic kidney disease undergoing dialysis;

**SABOT**
CONSULTING

SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

9.  People with chronic liver disease, including cirrhosis; and
10. People with hemoglobin disorders, including sickle cell disease and thalassemia.
11. All persons currently or in the future held at the jail in pretrial custody during the COVID-19 pandemic who are at increased risk of Covid-19 complications or death because of disabilities as defined in the Americans With Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.

In order to have a better understanding of the contested facts of this case, I read the pleadings and declarations submitted by both Petitioner-Plaintiffs and Respondent-Defendants.

In addition, I requested relevant documents from Petitioner-Plaintiffs' Counsel, Respondent-Defense Counsel, and Wellpath's Counsel in advance of my unannounced arrival at the Shelby County Pre-Detention Jail located at 201 Poplar Avenue, Memphis, Tennessee, 38103.

In addition from 0830hrs until approximately 2300hrs for three consecutive days, I conducted multiple in depth interviews with key personnel for the Shelby County Jail, key personnel with the contract medical provider, WELLPATH , walked the decks on each floor of the jail, inspected each of the living units, dayrooms, common areas, showers, toilets, medical clinic, intake/booking/release, interviewed staff and inmates on the first (0600-1400hrs) and second watch (1400hrs-2200hrs), inspected the holding cells, the court tunnel, the upstairs court holding cells, transportation vehicles, and from the control center on the lower level observed inmates being escorted through the court tunnel, placed in the holding cells, escorted upstairs to and from the General Sessions Court and Criminal Courts, and back through the tunnel toward their living units.

I was very fortunate to have newly promoted Lieutenant Styles as my security escort and guide. She is intimately familiar with all aspects of the Shelby County Jail operations and was responsible for the seamless scheduling of staff and inmate interviews, escorting me through any and all parts of the jail, gathering not only the documents I requested in advance, but additional documents that I needed as a result of my interviews and observations throughout my three days of  inspection. She was my security escort, scheduler, facilitator, problem solver, and reservoir of knowledge, from 0830 to 2300hrs every day of the three long days of my onsite inspection. We continue to communicate as needed this weekend for any additional documents I may need or questions I need answered as I pen this report. Without her assistance, it would have been impossible for me to have achieved the in depth understanding of all aspects of the Shelby County Jail Operations necessary to compete this inspection report. Thank you Lt. Styles.

I also want to acknowledge the Chief  Fields, Assistant Chief Hubbard, Assistant Chief Ward, Dr. Bruce Randolph, Dr. Judy Martin, Dr. Donna Randolph, Jeremy Sanders, Ms. Geeter,  Mischelle Best, and all their respective staff for allowing me to repeatedly take time away from their busy schedules to answer my questions and provide me with the documents I needed to verify the policies, procedures and practices about which they



spoke were in writing. They are consummate professionals who care deeply about the inmates in the Shelby County Jail.

At all times of the day or night, I had unrestricted access to key personnel and the jail facility. Shelby County Jail command staff and Wellpath leadership were transparent, responsive and open to new approaches in addressing the opportunities for improvement that I discovered during my court ordered inspection.

It is important to remember that during the course of my inspection, it was necessary for me to explore potential solutions to each area of concern I identified during my inspection. Recommending corrective measures to the Court that are not practical or doable would render my recommendations useless, a prolific waste of time, energy, and money. It was not my intent to usurp the authority of the Court or the interest of the parties in exploring those options, but rather to find meaningful, efficient, cost effective, and practical solutions to preventing and mitigating the spread of this highly contagious and oftentimes deadly virus among the vulnerable population housed in the Shelby County Jail.

**SABOT** CONSULTING

SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## THE JAIL SETTING

County Jail operations have many unique characteristics:

- Jails operate continuously, 24 hours per day, 365 days per year.
- Jails provide a wide spectrum of services, activities, and programs for inmates.
- Jails are high-risk settings where inmates are often dangerous to themselves and others.
- Jail populations have a significant percentage of inmates with chronic diseases serious medical conditions, serious mental illness, and disabilities
- Jail populations can fluctuate widely throughout the year, and even on a day-to day basis.
- Many jail inmates spend only a few hours in jail or a few days especially in light of the new bail statutes, pretrial release programs, and other court actions.
- Many other inmates remain in jail for months or years because of the serious nature of their charges or their inability to make even the lowest bail amount.
- Admission and release procedures require much staff effort, but the peak periods of admission are often difficult to anticipate (special events, parole/probation sweeps, gang sweeps, homeless camp sweeps, demonstrations, DUI checkpoints, etc.).
- Extensive Documentation is required for all activities and procedures at the jail.
- Perimeter security and internal movement must be controlled at all times.
- Supervision needs vary for different classifications of inmates.
- Jail staff, administrators, and funding officials can be held liable for substandard/constitutional deficient jail operations and conditions.
- Transportation to and from outside medical appointments, inpatient hospitalizations are difficult to anticipate and staff.
- Jails now are one of the largest and most challenging mental health treatment facilities in the country.
- The provision of quality medical care to an older, sicker, inmate population is incredibly expensive and challenging.

In recent years, recruiting and maintaining adequate badge staff has been extremely difficult and current events have exacerbated the problem. Many jails are short staffed and have to employ robust mandatory overtime initiatives that are unsustainable.

Couple these challenges with the current attempts to limit the spread of the highly contagious and deadly Covid-19 virus in the Shelby County Men's Pre-Detention Facility (hereinafter "the jail"), and it becomes exponentially more difficult.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## INSPECTION OBSERVATIONS - JUNE 23, 24, 25, 2020

It goes without saying that these are extraordinarily difficult and dangerous times in which we find ourselves thrust today. Operating a large county jail such as the Shelby County Jail is challenging, complex, and labor intensive.

Attempting to prevent/mitigate/eradicate the Covid19 virus within the secure perimeter of the jail, adds an additional daunting and extraordinarily labor intensive layer of multidisciplinary work that must be implemented with precision,  armed with the flexibility to adapt to new discoveries, guidance and directives from the CDC and Public Health in real time, and be monitored with hypervigilance to ensure its effectiveness.

As you can imagine, each county jail is unique and there is not a single Covid-19 operational response model that is effective for all jails. The core principals of social distancing, testing, tracing, and isolation must be present, but how those four core principals are implemented are oftentimes restricted because of the physical plant, population size, and staffing. Shelby County is no different.

On Tuesday morning, June 23, 2020 at approximately 0730hrs, I notified my security escort, Lt.  Styles that I would be conducting my inspection of the Shelby County Jail and that I would be arriving at the Shelby County Detention Facility at 0830. The date and time of my inspection was unannounced until one hour prior to my arrival.  Lt. Styles met me at a secure parking lot off Washington Street and we entered the jail through the employee entrance. I was wearing a surgical mask, and Lt. Styles was wearing a mask as well.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## COVID-19 SCREENING FOR EMPLOYEES

Immediately upon entering the jail outside the secure perimeter, there was an employee/contractor screening table. I was asked to fill out a "Coronavirus Screening" questionnaire which posed the following questions:

1. In the past 14 days, have you been outside of the United States and/or, on a cruise or been in contact with anyone who has? Yes_ No_ If so, When___ Where___
2. In the past 14 days have you been in crowded areas, (for example Airports, Conferences, Concerts, etc.)  YES__NO__ If so, When__ Where__
3. Have you or anyone you have had close contact with been diagnosed with or quarantined for Coronavirus? (The incubation period is 2-14 days) YES__NO__
4. Do you have a fever, cough, difficulty breathing, diarrhea, headache, loss of taste or smell or symptoms of lower or upper respiratory illness? YES__ NO__

My temperature was taken and recorded on the questionnaire.

At the bottom of the questionnaire, the final statement was "If answered yes to any of the questions above, please see the immediate Supervisor of the area."

The Supervisor of the area cleared me for entry into the secure perimeter of the jail.

While in the employee screening area, I paused and observed several employees enter the facility through that entrance and all were wearing face masks, filled out the questionnaire and had their temperatures taken. I was provided with the temperature logs from the employee screening area for the last 90 days.

This is the process that was followed each day that I entered the facility at 0830hrs. On days two and three, I was not escorted by Lt. Styles, but I followed the same routine.  Lt. Styles was already on the premises and came out from the secure perimeter to get me each morning and evening on days two and three.

Each day of my inspection, I paused in the employee screening area to observe employees entering the jail. 99.9 percent of the employees who entered the area were properly wearing their masks, had their temperature taken and filled out the questionnaire.

On day two of my Inspection, I observed two men in street clothes enter the screening area who were not wearing masks, did not practice social distancing, and were not issued masks prior to going in to the secure perimeter of the facility.  The security officer in charge of the secondary screening area did not stop them from entering the facility with no masks.

Once inside the secure perimeter of the building, I met with Chief Jailer Fields, and Assistant Chief of Security Hubbard to get a better sense of how their jail operated on a day to day basis, and to discuss some of the challenges they faced from their perspective in combating the spread of the Coronavirus in their facility. I found both Chief Fields and



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

Assistant Chief Hubbard to be welcoming, transparent, cooperative, and openminded. I was presented with two binders of documents that I had previously requested responsive to items 1-15 in the Inspection Order signed by Judge Lipman. At the conclusion of this report I will list the documents that I reviewed as part of this Inspection.

We were then joined by Dr. Judy C. Martin, PhD, NP-BC, Chief of Nursing for the Shelby County Health Department, and Jeremy R. Sanders, MPA, the Health Services Administrator for Wellpath for the Shelby County Jail. I spoke with them and let them know how I intended to conduct my inspection over the next several days.

After I met with the Jail Command Staff, I ask to see the entire jail facility from an inmate's arrival through the Sally Port through release. Over the course of the next several days, I would meet with and ask questions of a variety of key jail personnel, Shelby County Health leadership, and Wellpath leadership as well as inspect all parts of the jail in which vulnerable inmates and inmates with disabilities were housed, held or moved to and from (medical, mental health appointments, pill call, and court)

Dr. Martin and Mr. Sanders wished to accompany me on the first day, and I welcomed them because I wanted them to see what I saw in real time, and it was more efficient to have healthcare leadership present to answer any healthcare related questions about which Lt. Styles might not be intimately familiar.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## INTAKE/BOOKING/RELEASE

I began my inspection in the Intake/Booking area and the sally port where all law enforcement are required to bring arrestees for screening and booking.

24 hours a day, 7 days a week, 365 days a year all arresting agencies who enter the sally port are required to keep the inmate in the agency vehicle until it is there turn to present the arrestee for a pre-booking Covid19 healthcare screening.  They are asked a series of healthcare questions about any symptoms that they may be experiencing related to Covid19 and they are administered a temperature strip which is then passed back through a glass barrier to the nurse on the other side.

If the inmate is asymptomatic, they are issued a mask and placed in a holding cell inside the secure perimeter and they go through the normal booking process. The inmate is searched, photographed, fingerprinted, and interviewed by pretrial services. Pretrial Services administers a new Public Safety Assessment tool along with the old assessment questionnaire to determine if the inmate is eligible for release on his or her own recognizance (ROR) or if he or she will have a bond set by the Commissioner. The bond is set within the first 24 hours.

If they are not eligible for ROR, the inmate will be dressed out, processed through classification and housed in a general population isolation unit that is cohorted for 21 days. (Lower Level A-G)

If the inmate is symptomatic, the inmate is escorted immediately over to a tent area on the far end of the Sally Port, and healthcare staff and security staff come out in full hazmat PPE and conduct a more in depth healthcare screening to determine if the arrestee is suitable for confinement (Not in acute respiratory distress or suffering from some other medical condition that requires the inmate to be transferred to the ER at Region1 Medical).  If the inmate is suitable for confinement, the inmate is placed in full PPE including a hazmat jumpsuit, booties, facemask and eye protection and escorted to a medical quarantine area where he will remain for 21 days. Inmate is tested immediately with the nasal pharyngeal test for Covid19. The positive inmates' temperatures are taken daily, for 21 days, but no other Covid19 tests are performed. Wellpath uses a non-test based strategy for asymptomatic and symptomatic inmates. Inmates must remain in medical isolation for 21 days prior to being released to general population.

If an inmate is symptomatic, his clothing is placed in a hazmat bag and disposed of as hazardous material.

During the course of my inspection and multiple observations of the booking area, I witnessed an inmate being booked into the jail who was not wearing a mask and the arresting officer had his mask down below his nose. The inmate was allowed to enter the interior of the booking area without a mask and was placed in a holding cell. The inmate was without a mask for a significant portion of the booking process. Lt. Styles was present when I made this observation.



Moreover, we observed at least one officer with his mask down around his chin when he entered the booking area, and, on another occasion, down below his nose.

Episodic violations of the health screening process, and the mask policy for inmates and staff creates an undue risk of harm to the vulnerable inmates who are processed through the booking area.

I also inquired about the cleaning process for the intake/booking area and it was learned that while the common areas and phone banks are cleaned every hour, the holding cells are only cleaned at the beginning of the shift and one or two additional times. This practice while important, is insufficient to protect subsequent vulnerable inmates from an unreasonable risk of exposure to the virus as a result of a potentially asymptomatic positive inmate contaminating the hard surfaces in the holding cells, the phones, the toilets in the holding cells (we know that there have been at least two studies that suggest that the virus can be shed through stool and urine but further studies are needed).  I do want to note that this jail would be considered very clean in normal times. The floors are polished, the walls are clean, the empty cells are free of debris, human waste, and the toilets appear to be clean. It is obvious that the Command Staff go to great lengths to keep this older jail clean.



## MEDICAL

The next area I inspected was the medical clinic area. There is no Outpatient Housing Unit or Infirmary in the jail. Anyone requiring those services must be transported to an outside facility. The Wellpath staff conduct regular sick call and during this time of crisis use Telemedicine for much of their Physician appointments. I observed the clinic area and spoke with several nurses. The area was clean and I observed inmates being seen in the clinic and via telemedicine including on HIV patient communicating with his physician via telemedicine. All participants were wearing appropriate PPE and were properly social distancing.  I note that during the course of my three-day inspection, I did notice episodic violations of the mask policy by healthcare workers.

I also observed pill call on the housing units and noticed that there we newly installed markers for social distancing along the corridor where pill call is conducted. The inmates on the occasion of my inspection were properly social distanced and were wearing masks. While I observed some episodic violations of the mask policy by inmates having their masks down below their nose, staff was quick to direct the inmate to put the mask over their nose. In each case, the inmate complied.

When asked about outside specialty appointments for Chronic Diseases and Serious Medical Conditions, Wellpath's Medical Director, Dr. Donna Randolph told me that Region1health were not accepting appointments from the jail for several months during the Covid19 pandemic, but they have recently started accepting appointments again. She stated that it is still a challenge to get inmates in need of specialty care regular appointments because Region1health only accepts appointments for inmates one day a week and that single day must accommodate inmates from the Shelby County Penal Farm and the Federal Detention Facility located in Shelby County. There is a dialysis clinic that occurs at the jail regularly and the dialysis patients have not experienced any delays in their care.  I spent a considerable amount of time with Dr. Randolph and Mr. Sanders and I found them to be well informed and passionate about delivering competent medical care to the inmate population. The care that is delivered by Wellpath is hampered by reliance on resources they cannot control and as a result inadequate chronic care and specialty care may be occurring.



## MENTAL HEALTH

There is a housing unit for inmates who are suicidal and are on fifteen-minute checks. However, if any behavioral health inmate would be in need of more intensive care, they would have to be transported to an outside hospital. One practice that concerns me for this vulnerable population is that all inmates on 15-minute checks are issued suicide resistant smocks rather than following the best practice of evaluating the need for a smock on a case by case basis. The blanket policy of issuing smocks to everyone will discourage some inmates from revealing their suicidality because they don't want everything taken from them and to be stuck in a smock. Inmates view this as punitive. I spoke with the Mental Health Director Ms. Geeter regarding this issue. The SMI population is part of the vulnerable population as disabled inmates. This population more often than not has co-morbid medical conditions that require monitoring and treatment. Dr. Randolph and Ms. Geeter assured me that the SMI population are getting their labs done in a timely fashion (as I understand it some of the psychotropic medications can cause liver and kidney problems as well as significant weight gain) Wellpath has contracted with Lindsay Hayes, a nationally recognized expert on Suicide Prevention, and Mr. Hayes was scheduled to return to the jail for a follow up visit, but because of the Covid19 he has been unable to return to the jail.

I was pleased to observe several suicide resistant cells in this unit. These cells have eliminated the tie off points that are commonly used by inmates who are attempting to commit suicide. 90% of the suicides that take place in a jail setting are by hanging. The Mental Health Director, Ms. Geeter, personally trains security staff and non-security staff on suicide prevention practices. Ms. Geeter also uses Lindsay Hayes's suicide prevention manual and curriculum. The initial training is between six to eight hours (depending on the number of questions asked during the session) and the refresher training is two hours. Wellpath does not have a formal structure to their mental health delivery system, but Wellpath does employ one full time Psychiatrist, one half time Psychiatrist, several LMSWs, LPCs, LSWs, and one Psychiatric NP.

There are about 200 behavioral health inmates on the second floor, and there are approximately 150 more higher functioning behavioral health inmates scattered throughout the jail. Many of those inmates are on medication management only, but Ms. Geeter's team does not have a formal treatment program structure, but does deliver basic mental health services, special needs services, individual therapy, and crisis management and assessment.

One concern that I have is that Wellpath does not employ a Clinical Psychologist to formally test for Developmental Disabilities(DD) and Learning Disabilities(LD). The DD population who are in need of higher adaptive support are subject to victimization (sexual assault, other inmates stealing their commissary, carry drugs and weapons for gangs) and have short term memory problems, difficulty understanding directions, forgetting to shower, wash their hands, clean their cells, eat, etc. Ms. Geeter told me that anyone who is suspected of being DD is seen by a psychiatrist. The DD population can be as large as



two to four percent of the inmate population (38-76 inmates) with a much smaller number being profoundly DD requiring high adaptive supports and protection from victimization.

There is no formal testing that occurs for the LD population. Learning Disabled inmates do not want people to know that they cannot read, write, or have trouble understanding words, sentences and documents with which all of us may not struggle. It is important that effective communication is used with this population and that means using simpler words, talking slower, explaining the Covid19 education materials to them, etc. Equally important for them to have equal access to the programs, services, and activities in the jail, Wellpath must screen for and identify this population to make sure that security staff and program staff are effectively communicating with them, that they understand the Covid19 education materials and that they rules and regulations of the jail. The LD population while not medically vulnerable, they are disabled as defined by the ADA, and are entitled to accommodations for their disabilities.

I spoke with Ms. Jackson who oversees the crisis unit where suicidal patients are housed. She is very passionate about her job and has a very good relationship with the inmates in her unit. The time constraints around this inspection prevented me from spending more time with her and learning more about her unit.

Ms. Geeter and Ms. Jackson clearly care about this very vulnerable population and do their best to ensure the inmates in the Behavioral Health Delivery System are properly treated.

My next area of inspection was the housing units themselves. Lt. Styles, Dr. Martin, Mr. Sanders and went to all the living units together on the first day, and then Lt. Styles and I went back to the living units to interview inmates from the list of vulnerable inmates and inmates with disabilities the following two days. The vulnerable inmates/ADA inmates who are the subject of this Court ordered inspection are scattered throughout the jail in all security levels on all floors.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## MEDICAL ISOLATION LOWER LEVEL PODS A-K

In their Covid-19 response policies, procedures and practices, Wellpath and the jail represent that asymptomatic newly incarcerated inmates are medically isolated for 21 days and then released to general population living units commensurate with their security level.

However, I was told by several inmates that I interviewed that these newly incarcerated inmates do not remain in medical isolation from the rest of the population for 21 days as the Covid-19 response policy and booking flow chart represents.

Allegedly, throughout the 21 days the inmates are intended to be isolated from the rest of the jail population in order to prevent the introduction of the Covid-19 virus into the jail, they are required to be moved from their isolation units through the court tunnel and into holding cells for the General Sessions Courts and the Criminal Courts of Shelby County. The medically isolated inmates are mixed in the Division specific holding cells with 20-25 other general population inmates from throughout the jail for up to 4 hours. This occurs in the morning and afternoon multiple times a week. Most of the time, according to the inmates I interviewed, the inmates do not leave the holding cell or they are directed to walk up the stairs to the court hallway where they are handed a piece of paper and told their case has been reset for another date. The inmates then walk back down the stairs back through the court tunnel returning to their living units in the jail and the medical isolation units on the lower level.

In order to determine that this was actually occurring, during court hours, I went to the control booth in the lower level that keeps the court tunnel, the lower level holding cells, and the stairs to the courtrooms under constant camera surveillance. While in that control booth with Lt. Styles and the control booth security officer, I could see the constant inmate movement through the court tunnel to and from the holding cells. In the holding cells there were approximately 20-25 inmates in one, 16 in another, and 6 in another.  I observed some inmates were not wearing their masks. I observed inmates walking up and down the stairs to the courtrooms. I saw that there was no social distancing in two of the three holding cells.  I observed some security staff were not properly wearing their masks in the tunnel.

Once I verified this practice, I circled back and spoke with Chief Fields, Assistant Chief Hubbard, Dr. Donna Randolph, and Mr. Jeremy Sanders. All verified that this was taking place shared my concern about the practice, but felt they had no control over how the court handles their calendar and appearances.

This practice unquestionably puts vulnerable inmates and the ADA inmates at an unreasonable risk of harm from potential expose to asymptomatic Covid-19 positive inmates. Without an immediate change to this practice, it clearly renders any attempts to medically isolate asymptomatic newly incarcerated inmates from the rest of the jail population ineffective and of little value. The risk of infecting other inmates and introducing the Covid-19 virus into the general population of the jail is high.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

It should be noted that on the lower level there are two holding cells that have video hearing capability for the courts. Those holding areas are LLR and LLS.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

### FLOORS 1-6

While the pleadings and declarations I read in preparation for my inspection imply that nothing special is done for the vulnerable inmate population. During my inspection, I became aware that medical does have several small living units on the 2nd floor where they house medically fragile inmates (2B-2E, 2J, 2K, 2L). These inmates are medically fragile/ vulnerable inmates who need more intensive observation and treatment. The medical offices are on this floor. The ingress and egress to this unit is controlled, and medical has to approve anyone who is to be housed in this area. This area has a limited number of beds and currently is at capacity. During the course of my inmate interviews on this floor, several inmates complained that social distancing is not possible and that the living area, showers, and bathroom was dirty. After my interview with the inmates which occurred outside the living area for privacy reasons, I went into the living unit with Lt. Styles and we inspected the area for cleanliness. Lt. Styles and I both observed the living area and the bathroom to be in need of cleaning. Lt. Styles immediately directed staff to clean that living unit and bathroom. It is the policy of the jail that all inmates must wear masks and for the most part they were wearing masks, but some did not have masks on or they had the mask down below their nose. Individuals with COPD who have difficulty breathing are going to resist wearing these masks all the time because they restrict their breathing even further.

The third-floor houses Level 7 inmates and some Level 5 and 6 inmates. Given the current population levels in these units, it is not currently possible to property social distance under the current program structure. Most of the Pods have 35-38 inmates in a Pod with a capacity of 43.

The jail's current policy directive is that all inmates are to receive free soap and that soap is not to be confiscated if the inmates have more than one bar. The vulnerable inmates that I interviewed complained that if they have money on their books, the housing officers will not allow them to have free soap. The inmates complained that it is not possible to social distance because the dayroom is crowded with 20 or so inmates at a time. In one of my multiple interviews with Chief Fields across several days, I asked him about this and he told me that they inmates can have free soap by policy. I also noted that in these living units, there were hand sanitizer dispensers installed on the walls, but the inmates told me they could not access the hand sanitizer because it is behind the officer's desk which is out of bounds for inmates. The inmates did verify that recently there has been an increased effort to clean the living units more frequently. During my three days of inspection, I did observe a cleaning crew under the direction of Mr. Dwayne Johnson with biovex sprayers on their backs cleaning common areas throughout the jail. The inmates stated they were given cleaning supplies but the mops they were given to clean their cells were mops that everybody else had just used to clean their cells and they were concerned about cross contamination.

The fourth-floor houses Level 8 and 9 inmates, high profile inmates, overflow suicide watch, and two program pods. These living units are at or near capacity making social



distancing impossible under the current dayroom use policy. At least twenty inmates are out in the dayroom area together during dayroom time, and the tables only seat 4 inmates. Throughout my inspection tour I observed inmates out in the dayroom and although 99 percent were wearing masks, there just is insufficient room to properly social distance. The vulnerable inmates that I interviewed had similar complaints regarding free soap, and social distancing. The inmates did acknowledge the stepped-up cleaning of the common areas in the last several weeks. The hand sanitizer dispensers were located behind the security officer's desk and in an area that is out of bounds for inmates.

The fifth floor is a dormitory floor consisting of three units of 32 bunks totaling 64 beds each. 5A houses inmates with security levels of 1-5. 5B is a program dorm of 32 bunks totaling 64 beds. 5C houses security levels 5-6 and has 32 bunks totaling 64 beds. Each of these dormitories were not at capacity. It appeared they were at about 50 – 60 percent of capacity. There was some social distancing in these units but there were two to a bunk, and the occupied bunks did not always have a vacant bunk in between them. The vulnerable inmates I interviewed in these units had similar complaints regarding the availability of free soap, social distancing, and cleaning supplies. The living units appeared to be clean. The inmates acknowledge a recent increase in the frequency of the cleaning of the common areas. The inmates told me that the jail had just put in the social distancing markers in the pill call line and on the floors of the living units just last week. I observed the inmates wearing their masks but not universally. The some of the inmates on all floors complained about their masks falling apart. They acknowledged that the jail cleaning crews offered to disinfect their masks with the disinfectant, but they did not want them to do it because of the chemical smell and it takes a while for the mask to dry.

The sixth floor is a dormitory floor that consists of 3 living units of 32 bunks and 64 beds. It is currently empty. This area can house inmates who have security levels from 1-7.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

### POPULATION MANAGEMENT

As of June 29, 2020, the inmate population of the Shelby County Jail is 1854 inmates. The jail has a capacity of 2600. The jail currently books 38 inmates a day on average and releases 24 inmates a day on average. The jail is an older jail that was built in the 1980's and as a result, most of the cell doors are open bars are the top and are operated electronically via a control panel and Folger keys.  Approximately 8 different law enforcement departments within Shelby County book arrestees in the jail. Additionally, surrounding counties will request that the jail take some of their inmates when they reach capacity. The jail also currently houses Tennessee Department of Correction inmates who come back to Shelby County for court matters.

Reducing the population of the jail in these unprecedented times is a challenge. The jail as a matter of law cannot refuse to book an arrestee who is medically fit for incarceration nor does the Sheriff have the authority to release inmates to alternative forms of custody such as active GPS, supportive housing in the community, shelters, recovery homes, home detention, work release, etc. The authority to do that rests solely with the Shelby County Court. Currently the jail has a case expeditor to try and move cases along, but from my observations during my inspection the current practice of the Shelby County Courts and the attorneys representing the inmates is creating a significant backlog that is contributing to the size of the jail population. Cases are being postponed multiple times for lengthy periods of times allegedly without the consent or time waiver of the inmates. The inmates are not being provided their discovery packets until months after their arrest and detention. Attorneys are not visiting their clients and discussing their cases. Offers are not being made in an effort to resolve cases. The vulnerable inmates that I interviewed during my inspection complained about the lack of information. The failure of their defense attorneys to visit them. The failure of their attorneys to consult with them regarding waiving their constitutional right to a speedy trial. The court allegedly is refusing to release inmates who are committed non-violent crimes and are not a current threat to public safety. Defense attorneys are allegedly failing to present medical evidence of their client's serious medical condition to the court that would demonstrate the inmate is not currently a threat to public safety or to argue for placement in alternative forms of custody. They cannot present the evidence because they allegedly are not meeting with their clients and gathering the necessary evidence to present to the court.

In addition, the Tennessee Department of Correction is not accepting inmates who have been convicted and sentenced to prison. The jail houses state prison inmates who are back from prison to resolve some outstanding court matters.

Moreover, towns in Shelby county bring inmates to the jail when their jail reach capacity, and surrounding counties also bring inmates to the jail when their jails are allegedly at capacity.

As a result, the population continues to remain in the mid eighteen-hundreds with little room to enforce social distancing within the living units in the jail.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## STAFFING SHORTAGES

Currently the jail has 157 security staff vacancies and the Sheriff's Department is experiencing difficulty in their recruitment efforts to fill those vacancies. In addition, a recent staffing study that was completed found that the actual need for security staff is over 300 positions. Having significant staffing shortages like these is a contributing factor to consistently providing routine service to the vulnerable inmates in the jail.

## FINDINGS AND RECOMMENDATIONS

These findings and recommendations are not in order of importance.

FINDING #1

The Wellpath Covid-19 response plan is inadequate to protect the vulnerable inmates housed in the Shelby County Jail for the following reasons:

1. The newly booked inmate movement from medical isolation to the General Session and Criminal Courts and then back to the medical isolation unit completely undermines the integrity and purpose of the 21-day medical isolation that is designed to prevent the introduction of the Covid-19 virus into the jail population. The medically isolated Inmates are held in holding tanks in large groups with general population inmates for long periods of time (2-4 hours) multiple times in the 21-day isolation period. The medically isolated inmates are not tested at any time during their 21 day stay if they remain asymptomatic, nor are the inmates from general population who were already housed in the jail, but who have been exposed to a potentially positive asymptomatic inmate from medical isolation in the court holding tanks.  This presents an unreasonable risk of harm to the medically vulnerable inmates who are held in the holding tanks with the asymptomatic medically isolated inmates.

2. Through no fault of Wellpath, their timed out non-testing strategy designed to prevent  the spread of the Covid-19 virus in the jail, is rendered ineffective and useless as a result of the Court's insistence on the presence of the medically isolated inmates in court or near court during the newly booked inmate's 21 day medical isolation.

3. The jail does not cluster the vulnerable inmates in housing units together away from the general population. Wellpath does attempt to cluster the most medically fragile and vulnerable inmates in the medical area on the second floor, but the space is limited and the number of vulnerable inmates who are considered to be in a high-risk group is around 300 inmates.

RECOMMENDATION #1

1. It is recommended that Wellpath move to 14-day medical isolation with a nasal pharyngeal test-based strategy for symptomatic and asymptomatic inmates who are newly booked in the jail. The tests should occur between day 3 and day 6 for the initial test, and between day 10 and day 12 for the second test. All inmates in medical isolation must be asymptomatic for two consecutive days subsequent to



the final test results being received before they can be released to general population.

2. It is recommended that Wellpath and the jail command staff identify living units where the vulnerable population can be sequestered away from the rest of the general population inmates without losing their privileges or dayroom time consistent with their security level. The most medically fragile inmates and the inmates that are at the highest risk of serious illness or death if they contract the Covid-19 virus should be housed near the medical unit in case there is a white alarm. Areas that could be considered are the third floor and the Annex. Custody might be able to open the sixth floor living units which have 192 beds for the Level 7 inmates currently housed on the 3rd floor, and move some 3rd floor inmates from the third floor to the empty cells in the Annex.

FINDING #2

1. Wellpath and the jail command staff have no authority to compel the court to discontinue the practice of insisting on inmate's personal appearances in, at, or around the General Sessions Court or Criminal Court for initial appearances or to have their matters set over to another date. This practice increases the risk of inmate exposure and court personnel to Covid-19 infection because of the clustering of inmates in large holding cells and personal court appearances.

RECOMMENDATION #2

1. Consult with Dr. Bruce Randolph, Shelby County Health Officer, to see if he would be amenable to adding detention facilities to Shelby County Health Directive #7 or issuing a separate health directive for detention facilities in Shelby County. The language in the directive could read that "Any person detained in a detention facility should be isolated from the rest of the inmate population for 14 days if they are not eligible for ROR and cannot make bond. If the detained person is eligible for ROR or can make bond, they should be provided with a copy of Shelby County Health Directive #7 dated June 22, 2020 and instructed to follow that directive upon release. Nothing in this directive is intended to delay or impede the release of detained individuals if they are eligible to be released". This is in the best interest of public health, and detained people are members of the Shelby County community and should be protected from unreasonable risks of infection just like non-detained persons in Shelby County.

2. Consult with the General Sessions Court and Criminal Court and ask the Judges to use the existing video technology located in holding tanks LLR and LLS for arraignments, bond hearings, and other court proceedings that would not violate the inmate's 5th or 6th amendment rights.  In March, the Tennessee State Supreme Court issued an emergency order suspending in person court appearances for two weeks, but I am unaware of the validity of this order today. Technology such a

Skype, Zoom, Microsoft Team, Webex are also available and could be deployed in a cost effective and efficient manner while limiting the exposure of vulnerable inmates to infection.  Ms. Best, the Sheriff's Office Expeditor, is a former Judge and an attorney and could be very helpful in explaining the risk of spreading the Covd-19 virus among the inmate population if court continues to demand the inmates appear in, at or near the Courts in large holding tanks. The use of video arraignments, bond hearings, and other appearances would go a long way in reducing the risk of vulnerable inmates getting infected with the Covid-19 virus.

3. Wellpath leadership needs to be more aggressive and more vocal about protecting the vulnerable inmates in their care. There are several practices that take place in the jail that are potentially harmful to their patients, and they should not be allowed to continue. I recognize that Wellpath leadership feels powerless to insist that those harmful practices be discontinued, but in my expert opinion, Wellpath should have brought those harmful practices, at a minimum, to the attention of Dr. Bruce Randolph and documented that those harmful practices were brought to the attention of whatever entity they notified including the Court. Judges can be dismissive, but it is the responsibility of the medical provider to protect the health of the inmates in their charge and to speak up and advocate for the safety of their patients. I know this is an uncomfortable recommendation, but it is the right thing to do. Doing the right thing is not always easy, but it is always the right thing to do.

FINDING #3

1. The Shelby County Jail is not maximizing its efforts to enforce social distancing in its living units and should consider rethinking how it programs inmates in all areas of the jail.

RECOMMENDATION #3

1. Jail Command Staff could consider allowing fewer inmates in the dayroom area at the same time. By reducing the number of inmates in the dayroom at one time while continuing to enforce the mandatory mask order for staff and inmates who are in the dayroom, the risk of infecting others with the Covid-19 virus will be reduced. As an example, only allowing 6-8 inmates out in the dayroom at the same time on the 3rd, 4th, 5th, and 6th floors vs allowing 20 inmates out in the dayroom at the same time will substantially reduce the risk of person to person infection. In the dormitory living units, staff can put some inmates on bunk status until it is time for them to program in the dayroom. It is critical that the security officers enforce the directive that inmates properly wear masks. I did not physically go into the asymptomatic medical isolation units, but those inmates should only be coming out alone with masks properly worn until their medical isolation is lifted.

FINDING #4

1. During my jail inspection, it was apparent to me that living unit security officers are not following the directive that **ALL** inmates should be receiving free bars of soap not just the indigent inmates.

RECOMMENDATION #4

1. At the daily shift supervisors meeting, jail command staff should issue a directive to the floor Sergeants, Lieutenants, and Captains requiring them to direct living unit security staff to distribute free soap to the inmates in every unit twice a week until further notice. Furthermore, living unit security staff should provide each new inmate who enters the living unit with an information sheet that provides the inmate with Covid-19 education materials and a statement that they are entitled to free soap twice a week and that they will not be written up if they have more than one bar of soap in their possession. If security staff do not follow this directive, they should be disciplined.

FINDING #5

1. During my jail inspection, I found that the mops used for cleaning were not disinfected frequently enough and the mop heads changed frequently enough. Clean towels for cell cleaning were not available to inmates. In some living units, it was obvious that none of the housing officers on any of the three watches were ensuring the living units, dayroom areas, and the bathrooms were being mopped and scrubbed. Spraying Biovex on the toilets and in the bathrooms is inadequate. The floors need to be mopped regularly and the toilets and showers scrubbed regularly. This was not the case in every unit, but it was certainly the case in some.

RECOMMENDATION #5

1. Twice a week, every living unit in the jail should have a deep cleaning overseen by the security officer and the living units should be inspected by the floor sergeant. Inmates should have the opportunity to clean their cells every day at a specified time that does not take away from their dayroom time. If the living unit is not spic and span, the inmate's dayroom time should be suspended until such time as the living unit is spic and span. In addition, the living unit security officer should be disciplined for not keeping their living unit clean. Taking pride in your work area is a fundamental principal and best practice for a paramilitary organization.

FINDING #6

1. During my inspection, I did see episodic violations of the mandatory mask policy for staff and inmates. I also witnessed Sergeants and Lieutenants not strictly enforcing the mandatory mask directive. I also witnessed security staff that had to be told repeatedly to pull their mask up over their nose. Staff should not have to be told two or three times to properly. In the intake/booking area, I witnessed an inmate enter the interior booking area without a mask. He was allowed to walk around the booking area without a mask for some time. A Memphis Police Officer also was not wearing his mask correctly.

2. In my expert opinion, some floor Sergeants, and Lieutenants are over familiar with their subordinates. By that I mean, they act like friends rather than the supervisor of the rank and file security staff. As a result, the rules are not rigorously enforced, rank and file security staff are not held accountable and disciplined for not following the Covid-19 directives. In one instance, 3 rank and file security staff were in a Sergeant's office with the Sergeant and they did not have their masks on and they were not properly social distancing. This should never happen.

RECOMMENDATION #6

1. Floor Sergeants, Lieutenants, and Captains need to be hypervigilant in enforcing the mandatory mask directive for staff and inmates. In fact, they need to be hypervigilant in enforcing all of the Covid-19 policies, procedures, and practices.

2. It is critical that supervisors maintain their professional distance from subordinates. Overfamiliarity breeds contempt and as a result supervisors become unwilling to enforce policy and discipline non-compliant subordinates. This will poison the well and all the great work that management has done to fight the spread of this virus will go for naught, and many of the vulnerable inmates will unnecessarily become seriously ill and die.

3. I recommend that Chief Fields and Assistant Chief Hubbard increase their presence on the decks and spot check compliance with the Covid-19 policies, procedures, and practice including the cleanliness of the living units, dayrooms, and bathrooms.

4. I recommend that the jail consider creating a compliance unit whose sole responsibility is to audit compliance with department policies, procedures, and practices. This unit can develop an internal audit tool and audit the jail quarterly for compliance. A quarterly report then should be filed with command staff and a corrective action plan should be developed to correct any identified deficiencies. This is important to protect the vulnerable inmates from an unreasonable risk of harm due to policy violations.

FINDING #7

1. The Covid-19 educational materials are not at a 6th grade reading level. The materials are posted on the wall, and there is a Covid-19 education cartoon that is played at 0800 and 1500 hours every day on the living unit TVs. Many inmates in the jail are learning disabled, developmentally disabled, and seriously mentally ill and do not understand the word or concepts on the Covid-19 material.

RECOMMENDATION #7

1. Create a Covid-19 information sheet that is at a 6th grade reading level. This information sheet should be provided to every inmate who is booked in the county jail and again when they reach their assigned housing unit after being taken off medical isolation. It should also be posted on the wall of every living unit, and the living unit security officer should make sure the inmate understands the information on the sheet when they orient the inmate to the living unit rules and regulations. This information sheet should be available in audio and large print for the visually impaired and blind.

FINDING #8

1. Cleaning supplies for high touch surfaces such as telephones and kiosks are not readily available for inmates to use after each inmate uses those high touch items.

RECOMMENDATION #8

1. Place an EPA approved cleaning solution in a spray bottle with a supply of paper towels in an area in the living unit where inmates can readily access it for cleaning the phone, kiosk and other surfaces after every use. The jail is a Direct Supervision Jail, and security staff are in the living units and can supervise its use or assign a pod worker to that responsibility. Many inmates are indigent and assigning inmates with a pay number at .20-.50 cents an hour will allow the inmate pod worker job to be attractive. First Watch and Second watch can each have their own pod workers to assist the housing unit security officer with the management of the cleaning supplies.

FINDING #9

1. Some inmate masks I observed were in disrepair and were dirty. Inmates only are issued a single mask.

**SABOT**
C O N S U L T I N G

SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

RECOMMENDATION #9

1. Issue the inmate population two cloth masks one of which can be exchanged with the weekly laundry exchange. During laundry, the masks should be inspected and replaced if they are in disrepair. Masks should not be sprayed with Biovex. The manufactures warnings state that Biovex is considered to be a mild irritant and can cause irritation of the eyes, ears and throat. Vulnerable inmates may have an adverse reaction to this substance being sprayed on their masks especially those with COPD or moderate to severe asthma.

FINDING #10

1. Wellpath does not test for Intellectual Disabilities or Learning Disabilities. Currently a Psychiatrist interviews inmates who are suspected to be intellectually disabled, but there is no testing for learning disabilities. Identifying the intellectually disabled and the learning disabled is important for informed consent as well as effective communication and victimization concerns.

RECOMMENDATION #10

1. Wellpath may want to consider hiring a Clinical Psychologist to test for intellectual disabilities and learning disabilities. Some experts have found that there may be as many as 2-4% of the inmate population that are intellectually disabled with a much smaller percentage being profoundly intellectually disabled needing high adaptive supports and protection from victimization.

FINDING #11

1. During my inspection and interviews, I came to the conclusion that there is no concentrated and coordinated effort to assemble and present information to the courts regarding an inmate's medical conditions that may make him vulnerable to serious illness or death while housed in the jail. Moreover, while I find Mischelle Best, the Court Expeditor, to be hard working and passionate about her job, I am concerned she is spread too thin and has to do the job of a competent criminal defense attorney in addition to her other duties. Nor is there any consistent multi-disciplinary effort within the jail to secure alternative custody venues for vulnerable inmates. I found that a significant number of these inmates had very serious charges, but some have been charged with garden variety felonies and, in my expert opinion, because of their medical condition are not a current threat to public safety if they were placed in a structured and supervised environment.

RECOMMENDATION # 11

1. Create a multi-disciplinary task force within the jail to present the medical conditions of the inmates who along with their non-violent offenses make then



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

good candidates for release to alternative custodial settings. Technology has come a long way and alternatives custodial environments work well in many other states and jurisdictions.

.



## CONCLUSION

During the course of my jail inspection, I came to believe that the Shelby County Jail leadership team are consummate professionals who do embrace and promote the "care" component of the inmates in their custody, care, and control. They repeatedly told me that they were open to making any changes that would improve their operation and increase the health and safety of all the inmate population but especially the vulnerable inmate population. Their ability to decrease the size of the inmate population in the jail is limited by their authority to limit the intake of new inmates and by their complete lack of authority to place any inmates in alternative custodial environments. The fact that the Shelby County Jail is accredited by the ACA and the National Commission on Correctional Health Care is evidence of their desire to have a well-run jail that delivers patient centered healthcare. What I found during my inspection were opportunities for improvement in some critical areas that are plagued by episodic violations of well-intentioned and well thought out policies procedure and practices designed to maximize the protection of the vulnerable inmate population.

The Shelby County Jail medical provider, Wellpath, is also dedicated to delivering patient centered, competent medical care to all the inmates but especially to the medically fragile inmates who are the most vulnerable to serious illness or death from the Covid-19 virus. The effort of Wellpath to deliver consistent care to the inmates with chronic illnesses and serious medical conditions is hampered by the unwillingness of outside hospitals and specialty clinics to treat inmates. I find that deeply offensive and dangerous, but I am hopeful that Dr. Bruce Randolph can assist Wellpath and the Shelby County Jail in expanding the medical resources available to them in the community to treat those inmates who are in desperate need of treatment of their chronic diseases and serious medical conditions. The inmates in the Shelby County Jail are members of the Shelby County Community and most of them will return to the community in less than 18 months. Ironically those same inmates who are currently being refused treatment by community providers and hospitals will seek treatment at those very same hospitals without shackles and will not be refused treatment.

Given the reality of what is occurring with the Shelby County Courts and the inability of the jail to reduce its population, the jail and its medical provider must adjust their Covid-19 response strategy for the protection of all inmates but especially the vulnerable inmates.

The jail is a high-risk environment for these vulnerable inmates, and I am hopeful that my recommendations will be adopted in order to reduce their risk of infection and serious illness or death.

No jail will ever be perfect in performing its duties, but the Shelby County jail must embrace the necessary changes to its Covid-19 response strategy or risk losing control of



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

its jail to a plethora of class action lawsuits, restraining orders, and/or population caps. The choice is theirs to make.

Thank you for the opportunity to work on this very important project.

SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

**Signature**

Respectfully submitted,

_____        June 29, 2020
                                        _____
Mike Brady                              Date
Director
Sabot Consulting



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

## EXHIBIT 1 – INSPECTION ORDER

Case 2:20-cv-02359-SHL   Document 56   Filed 06/18/20   Page 1 of 4   PageID 843

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| FAVIAN BUSBY and MICHAEL EDGINGTON, on their own behalf and on behalf of those similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>FLOYD BONNER, JR., in his official capacity, and SHELBY COUNTY SHERIFF'S OFFICE, )<br><br>Defendants. ) | No. 20-cv-2359-SHL |

**INSPECTION ORDER**

Pursuant to Federal Rule of Evidence 706, the Court hereby appoints Michael K. Brady as an expert witness in the field of jail and prison operations as it relates to the prevention and mitigation of the spread of infectious diseases and public health in the correctional setting. The appointed expert shall provide information to the Court responsive to the Plaintiffs' Motion for Temporary Restraining Order (ECF No. 2), and render an expert opinion on the current health and safety of medically-vulnerable Plaintiff-detainees at the Shelby County Jail ("the Jail")[1] in light of the COVID-19 pandemic, including but not limited to the Facility's compliance with the pertinent CDC and Shelby County Public Health guidelines and other applicable standards. The expert's findings shall include, if warranted, recommendations regarding corrective measures that, in his expert opinion, should be implemented at the Jail to protect the medically-vulnerable from the COVID-19 virus at the Facility.

---

[1] The Jail is located at 201 Poplar Avenue, Memphis, TN, 38103.



SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

Further, the Court **ORDERS** that Mr. Brady shall be granted <u>unrestricted</u> access to the Facility unannounced, and may bring with him laptops or other similar equipment with internet access, cameras, cell phones, writing implements, and any other equipment required to conduct his site visit/s.  Once in the Facility, Mr. Brady shall be permitted to inspect areas of the facilities without limitation and shall be permitted to speak with staff and inmates in confidence and outside of the presence of Facility supervisors and staff.  The inspection shall take place anytime between the hours of 8 a.m. and 11 p.m. on any day of the week and may last for 1-2 days.  The inspection will be unaccompanied by either Party, and Defendants shall make available a security escort and guide who is familiar with the Facility and its policies and procedures.

Defendants are further **ORDERED** to make available reasonable personal protective equipment, including but not limited to N95 masks and protective eyewear to Mr. Brady and shall permit him to bring within the Jail such personal protective equipment as he deems necessary.

It is further **ORDERED** that Mr. Brady may confer with counsel for the Plaintiffs and Defendants each, *ex parte*, at his sole discretion.  Mr. Brady shall annotate any conferences with either Party in his report.

It is further **ORDERED** that Mr. Brady shall be permitted to review all pertinent Facility and detainee records and documents including medical and mental health records, electronic or otherwise, and video footage in connection with his investigation.  Mr. Brady is empowered to

2

make document and records request to the Parties and their healthcare provider.[2]  The Parties

shall respond to Mr. Brady's requests in a timely fashion.

It is further **ORDERED** that the Facility shall make all supervisors and staff available for

interviews, including telephonic interviews conducted by Mr. Brady or his associates

immediately and without undue delay, if requested by Mr. Brady.

Mr. Brady shall provide a written report to the Parties and the Court as soon as possible,

but no later than **June 29, 2020**.  The report should address, at minimum, the Inspector's findings

on the following issues, to the extent, in the opinion of Mr. Brady, these issues impact medically-

vulnerable detainees:

(1)     the Jail's Pre-Intake /Intake procedures;

(2)     the Jail's Quarantine /Isolation procedures;

(3)     the Jail's efforts to educate inmates/detainees preventing the spread of COVID-19;

(4)     the Jail's efforts to train facility staff on preventing the spread of COVID-19, including policies and procedures;

(5)     the Jail's cleaning practices in light of COVID-19;

(6)     the availability of hygiene products, cleaning products, and personal protective equipment ("PPE") to inmates/detainees, particularly the medically-vulnerable;

(7)     the Jail's efforts to implement social distancing;

(8)     the Jail's efforts to limit movement in the Jail;

(9)     the Jail's policies concerning medically screening staff and/or visitors to the Jail;

(10)    the Jail's responses to inmates who test positive for COVID-19;

---

[2] If a Party believes it is necessary to protect a particular document, it may provide said document with a confidentiality agreement to Mr. Brady directly.  The Court will address any additional dispute, if necessary.

3

SHELBY COUNTY MENS JAIL
COVID19 INSPECTION
JUNE 29, 2020

(11)    the Jail's treatment of medically-vulnerable inmates/detainees as defined by the Centers for Disease Control and Prevention;

(12)    detainees' access to healthcare when they exhibit symptoms associated with COVID-19;

(13)    the Jail's efforts to reduce the population of the Jail due to COVID-19;

(14)    any other aspect of confinement which the Inspector believes is relevant to protect the medically vulnerable; and

(15)    how all of the above has progressed throughout the COVID-19 pandemic.

To the extent the inspection, review, and report includes protected health or other sensitive information, it shall be kept in restricted or under seal access pursuant to this Court's protective Order to be issued by separate filing, if necessary.

Nothing in this Order precludes either party from hiring its own expert to conduct its own inspection.

**IT IS SO ORDERED**, this 18th day of June, 2020.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE

4