**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **FAVIAN BUSBY, ET AL.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No.: 2:20-CV-02359-SHL** |
| | ) | |
| **FLOYD BONNER, JR., ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**RESPONDENTS-DEFENDANTS' RESPONSE TO PETITIONERS-PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (ECF No. 114)**

Respondents-Defendants, Floyd Bonner, Jr., Shelby County Sheriff and the Shelby County

Sheriff's Office ("Respondents-Defendants"), respond in opposition to Petitioners-Plaintiffs'

Proposed Findings of Fact and Conclusions of Law (ECF No. 114) as follows:[1]

**ARGUMENT**

A.     EXPERT TESTIMONY

On June 12, 2020, the Court ordered an inspection of the Shelby County Jail (the "Jail")

by an Independent Inspector. (ECF No. 45, PagedID 734). In so doing, the Court directed the

parties to each propose two inspectors for the Court to consider. (*Id*). In accordance with the

Court's directive, the parties each submitted to the Court two proposals. Among Respondents'

recommendations was Mike Brady. Among Petitioners' recommendations was Dr. Homer

Venters. On June 18, 2020, the Court selected Mr. Brady and ordered him to perform an inspection

of the Jail. (ECF No. 56). After the Court chose not to appoint Dr. Venters as the independent

---

[1] In doing so, Respondents-Defendants additionally rely upon their previously-filed Proposed Findings of Fact and Conclusions of Law (ECF No. 112) and upon the record as a whole.

inspector, Petitioners hired him themselves.

### a.      Mike Brady

In accordance with the Court's Order, Mr. Brady inspected the Jail for three consecutive days on June 23, 24, and 25, 2020. (ECF No. 80). During his inspection, he toured the vast majority of the Jail, conducted multiple in-depth interviews with "key personnel" of the Jail, Wellpath, and the Shelby County Health Department, and reviewed over two thousand pages of policies, procedures, directives, medical records, and other documents related to the Jail's response to COVID-19. (ECF No. 80, PageID 1173).

In performing his inspection, Mr. Brady found Jail officials to be "welcoming, transparent, cooperative, and openminded." (ECF No. 80, PageID 1175). He reported that Jail officials are "consummate professionals who do embrace and promote the 'care' component of inmates in their custody, care, and control." (ECF No. 80, PageID 1195). He reported they indicated an openness to "making any changes that would improve their operation and increase the health and safety of all the inmate population but especially the vulnerable inmate population." (ECF No. 80, PageID 1195).

Mr. Brady agreed that the Jails' policies, procedures and practices designed to maximize the protection of the vulnerable inmate population were "well-intentioned and well-thought out," but found room for the Jail to improve in its response to COVID-19. Specifically, Mr. Brady made findings and recommendations for the Jail to consider implementing to better respond to COVID-19. He agreed that his concerns could be remedied by the Jail, and while Respondents dispute many of Mr. Brady's observations, the Jail immediately began implementing changes to its COVID-19 response in light of his recommendations, further solidifying its past and continued willingness to evolve its practices to better protect its detainees. (*See* ECF No. 112, n. 1-10).

### b.        Dr. Homer Venters

On July 7, 2020, Dr. Venters performed an inspection of the Jail and later testified on behalf of Petitioners.[2]  Petitioners paid Dr. Venters $500 an hour for his services. (ECF No. 108, PageID 2006). Unlike Mr. Brady, Dr. Venters inspected the jail for less than four hours. (ECF No. 108, PageID 2089). During his inspection, Dr. Venters did not review any policies, procedures, protocols, or directives of the jail. (ECF No. 108, PageID 2032, 2089). He did not visit most portions of the Jail and did not even review or consider how the Jail educated detainees on preventing the spread of COVID-19. (ECF No. 108, PageID 2049, 2089). Though "chronic care" and "medically vulnerable" inmates largely overlap, Dr. Venters did not review or consider how the Jail treats chronic care inmates, nor did he review medical's process in assessing detainees' medical needs. (ECF No. 108, PageID 2034-36; 2038, 2041, 2049, 2066). In fact, Dr. Venters does not know who or why a detainee is placed on the second floor of the Jail because he never "asked." (ECF No. 108, PageID 2045). Dr. Venters made dramatic conclusions that COVID-19 is present throughout the Jail, but did not even analyze the Jail's "case, morbidity, or mortality rates" to support such a conclusion. (ECF No. 108, PageID 2071). In formulating his opinions, Dr. Venters claims he focused on the "practices that were in place," which he observed for less than four hours.

---

[2] Dr. Venters has a consistent history of testifying on behalf of incarcerated individuals in opposition to correctional institutions and their officials. For example, in the past three months, Dr. Venters has testified against the Metropolitan Detention Center in Brooklyn, New York (*See United States v. Favreau*, 2020 U.S. Dist. LEXIS 102044 (D. Me. June 11, 2020), *Chunn v. Edge*, 2020 U.S. Dist. LEXIS 100930 (E.D.N.Y. June 9, 2020)), the Metropolitan Correctional Center in Manhattan (*See Fernandez-Rodriguez v. Licon-Vitale*, 2020 U.S. Dist. LEXIS 116749, at *90 (S.D.N.Y. July 2, 2020), *United States v. Lugo*, 2020 U.S. Dist. LEXIS 98323, at *2 (D. Me. June 4, 2020)), two Ohio County jails, (*See Refunjol v. Adducci*, 2020 U.S. Dist. LEXIS 98991 (S.D. Ohio June 5, 2020)), the Chesapeake Detention Facility in Baltimore, Maryland (*See United States v. Lawson*, 2020 U.S. Dist. LEXIS 96635 (D. Md. June 2, 2020)), the Northeast Ohio Correction Center (*See United States v. Gage*, 2020 U.S. Dist. LEXIS 95513, at *2 (N.D. Ohio May 27, 2020)), the Cook County Jail, (*See Mays v. Dart*, 2020 U.S. Dist. LEXIS 73230, at *36 (N.D. Ill. Apr. 27, 2020)), the Folkston Facility in Georgia (*See Benavides v. Gartland*, 2020 U.S. Dist. LEXIS 119858, at *21 (S.D. Ga. July 8, 2020)), and the Calhoun County Correctional Facility in Michigan (*See Malam v. Adducci*, 2020 U.S. Dist. LEXIS 83135, at *3 (E.D. Mich. May 12, 2020)). Said list, while lengthy, is not exhaustive.

(ECF No. 108, PageID 2033). Based upon the limited time that Dr. Venters inspected the Jail, his testimony should be accorded minimal, if any, weight.

### B.   FAILURE TO ESTABLISH RISK OF SEVERE ILLNESS OR DEATH

Petitioners continue to assert that they will suffer irreparable harm without immediate action from this court. The facts in the record simply do not support such a conclusion. No detainees housed at the Jail have died from COVID-19, and only two detainees have required hospitalization due to COVID-19, neither of which required the use of a ventilator. (ECF No. 99-1, PageID 1493). Moreover, Petitioner Russell Leaks – the only detainee who previously tested positive for COVID-19 to provide testimony in this cause – confirmed that he did not have to be hospitalized, that he is no longer experiencing symptoms, and that he did not pass the virus to his cellmate. (ECF No. 108, PageID 1999, 2001). Thus, while Defendants in this matter acknowledge the general danger posed by COVID-19, the proof before the Court does not support the Petitioners' proposition that any of the named Petitioners or members of the class/subclass will contract COVID-19 and experience severe illness or death if the Court denies them release.

### C.   EVOLVING RESPONSE TO COVID-19

#### a.   *COVID-19 Testing Procedures*

Petitioners' argument that the Jail does not "test adequately" is unsupported by the record. All parties acknowledge that COVID-19 positive individuals may be asymptomatic. In light of such possibility, the Jail implemented a "timing-out" strategy by requiring all new detainees to quarantine for fourteen to twenty-one days prior to being placed in general population. (ECF No. 111, PageID 2114, 2120). Mr. Brady agreed that such a "timing-out" strategy is effective. Specifically, he testified that "there are couple of ways to go about trying to mitigate or reduce the spread of the COVID-19 virus in a correctional setting.  One of them is timing out the virus." (ECF

No. 84, PageID 1221). If you medically quarantine a new detainee for fourteen to twenty-one days, "you'll timeout that virus." (*Id*).  Thus, the "timing out method" is an "effective way" of preventing the COVID-19 virus from entering the facility. (ECF No. 84, PageID 1271-72).

Mr. Brady criticized the Jail's "timing-out" strategy due to newly quarantined detainees being moved from quarantine to the General Sessions and Criminal Courts at the same time that detainees housed in general population were transported to court. (ECF No. 80, PageID 1187-88). Mr. Brady's criticisms relate to detainees placed on secured "new admittee quarantine." However, inmates placed on medical quarantine because they have been exposed to a COVID-19 positive detainee have never been escorted to the tunnel or court holding cells. (ECF No. 111, PageID 2118-19; 2136-37). Notwithstanding, Mr. Brady's concerns have now been remedied. After Mr. Brady made his findings, SCSO officials shared those findings with Judge John Campbell. (ECF No. 111, PageID 2235). In light of Mr. Brady's concerns, Judge Campbell made procedural changes to "dramatically" diminish the "number of people who are in the jail…being transferred to Court." (ECF No. 111, PageID 236). Specifically, Shelby County Criminal Judges are not requiring near as many in-person appearances, which reduces the amount of traffic in the tunnel between the Jail and the courts, and are holding and/or intend to hold more video hearings and arraignments. (ECF No. 111, PageID 2156, 2236-38). For the limited number of detainees still required to personally appear, Jail personnel have placed chairs along with six-foot markings in the tunnel and have inserted markings within the holding tanks to provide social distancing guidance which prevents detainees on quarantine from "mixing" with detainees in general population. (ECF No. 111, PageID 2156-57, 2236-39; ECF No. 101-1). Judge John Campbell testified that these changes have resulted in a "night and day" difference as there are now only a "few" detainees that are moved at any given time to appear in Court and for those that are, they

remain separated by at least six feet. (ECF No. 111, PageID 2238-39).

Notwithstanding, the Jail continues to be willing to evolve its response to COVID-19. Chief Fields testified that the SCSO has been and remains in communications with Wellpath, as well as the Shelby County Health Department, and is considering implementing a "test-based" strategy whereby all new detainees are tested for COVID-19. (ECF No. 111, PageID 2155-56). Dr. Bruce Randolph confirmed that such an approach is one that the Shelby County Health Department in coordination with Wellpath and the SCSO is considering. (ECF No. 114-3, PageID 2559, Pg. 112:12-14). In doing so, the Health Department, SCSO, and Wellpath are considering the "resources, supplies, people," and other factors, including a "cost benefit" analysis of whether testing asymptomatic detainees multiple times would be justifiable. (ECF No. 114-3, PageID 2559, Pg. 112:12-113:12). While the involved parties consider moving to a "test-based" strategy, Dr. Randolph reiterated that the Jail's "timing-out" strategy effectively prevents new detainees from introducing the virus to the general population. Specifically, he testified, "[A]s it relates to asymptomatic people, you could also just simply wait. And if they develop symptoms, then test. Or just wait for 14 days or 21 days, and pretty much we would consider them not to be infectious." (ECF No. 114-3, PageID 2559, Pg. 111:17-21). Because Respondents have implemented an effective "timing-out" strategy, Petitioners' claim that the Jail is failing to "track and contain" the spread of COVID-19 through the admittance of new detainees is without merit.

Additionally, Petitioners mislead the Court when they assert that the SCSO performed no COVID-19 testing on detainees from April 30, 2020, to June 10, 2020. No extensive testing was performed between those dates. (ECF 103-2, Respondents' Response to Interrogatory No. 2, explaining, "The Shelby County Health Department conducted extensive testing," on specific dates; ECF No. 114-3, PageID 2545, Pg. 54:6-57:10). However, it is undisputed that when a

detainee at the Jail exhibits symptoms of COVID-19, medical personnel are immediately notified and said symptomatic individual is tested. (ECF No. 99-1, PageID 1487-88; ECF No. 108, PageID 2054; ECF No. 111, PageID 2115, 2127; ECF N0. 103-2, Respondents' Response to Interrogatory No. 2, explaining, that in addition to the extensive testing done, other detainees have tested positive while "displaying COVID-19 symptoms during pre-screening or while incarcerated in the Shelby County Jail."). Thus, detainees have received COVID-19 tests by WellPath at various times prior to and after April 30, 2020. In fact, no detainee in the Jail with COVID-19 related symptoms has not been tested. (ECF No. 111, PageID 2127; ECF No. 114-3, PageID 2543; Pg. 48:14-49:7). Similarly, Petitioners mislead the Court when they assert that no SCSO staff were tested from April 30, 2020, to June 10, 2020. Again, no extensive testing of staff occurred between those dates, but numerous SCSO staff members received tests for various reasons at other times by private entities. (ECF 103-2, Respondents' Response to Interrogatory No. 2).

### b.      Jail's Quarantine/Isolation Procedures

Petitioners' assertion that the Jail has "no effective medical isolation or quarantine" is unsupported by the record. It is undisputed that any inmates who test positive for COVID-19 are immediately isolated from all other detainees, are housed in Alpha Pod within the Jail's medical department on the second floor, and are prohibited from traversing through the Jail. (ECF No. 27-1, ¶ 21; ECF No. 99-1, PageID 1469-70, 1487-88; ECF No. 111, PageID 2128). They, like all detainees in the Jail must wear a facial mask at all times. (ECF No. 27-1, ¶ 20; ECF No. 111, PageID 2145-46). Said detainees remain in medical isolation for at least twenty-one days, if not longer, until they are no longer symptomatic. (ECF No. 27-1, ¶ 21; ECF No. 99-1, PageID 1521; ECF No. 111, PageID 2135). While in isolation, they are not allowed to leave their isolation pod and are never taken to court. (ECF 111, PageID 2135-36).

In attacking Respondents' quarantine and isolation procedures, Petitioners' rely upon their hired expert, Dr. Venters. Despite not reviewing any Jail policies or procedures, conducting no rate analysis, and spending less than four hours at the Jail, Dr. Venters concluded that the Jail is not and cannot be made safe for medically vulnerable detainees based upon the theory that COVID-19 is "aerosolized."  Because Pods 2A and 2N are made up of "open bars," he claims, in a conclusory manner, that that the hallway outside of medical isolation is "full of COVID-19" despite the fact that the pods are over ten feet apart and that no detainees come anywhere near the detainees isolated in Pod 2A.[3] (ECF No. 108, PageID 2072). Said opinion is not supported by current CDC guidelines, and Dr. Venters ultimately admitted that he "is not an expert" on how far COVID-19 actually travels. (ECF No. 108, PageID 2072-73.) Thus, Dr. Venters' theory that COVID-19 is travelling from pod to pod is based merely on speculation, not on any proven, scientific finding.

The Jail's quarantine and isolation strategies fully comply with CDC guidance on preventing the spread of COVID-19. Among other precautions, said procedures (1) provide for the isolation of all COVID-19 tested positive detainees, (2) provide that all detainees who have been in contact with a positively tested detainee are quarantined, and (3) allow all other detainees to remain well more than six feet apart from any COVID-19 positive detainee while said detainee remains in isolation. While Dr. Venters may recommend that the Jail implement different quarantine and/or isolation strategies, such recommendations do not support a finding that the Jail's current quarantine and isolation procedures are inadequate in light of current CDC guidance.

---

[3] Because Dr. Venters did not visit most portions of the Jail, he did not know or understand that not all pods in the Jail are made up of "open bars." Specifically, the pods and cells in the Annex have solid doors and walls throughout, but during Venter's brief time at the Jail, he did not visit the Annex. (ECF No. 108, PageID 2089).

### c.     Treatment of "Chronic Care" Detainees

Contrary to Petitioners' assertions, the Jail employs numerous efforts to protect the medically vulnerable from contracting COVID-19. At all times relevant, Wellpath and the Shelby County Health Department have had policies in place at the Jail concerning medical care for detainees suffering from chronic conditions. (ECF No. 99-1, PageID 1510). Additionally, at all times relevant, the Jail has followed the mandatory chronic care policies of governing bodies that review the Jail. (ECF No. 99-1, PageID 1510). Since the initiation of the COVID-19 pandemic, WellPath medical personnel at the Jail have participated in WellPath COVID Huddle meetings, which are attended by medical providers and administrators from around the country involved in the response to COVID-19 within the correctional setting, to stay up-to-date on policies on COVID and with the CDC guidelines (ECF No. 99-1, PageID 1449-50), and the senior leadership in the SCSO, Shelby County Health Department, and WellPath meet two times per week to obtain updates concerning the COVID-19 pandemic as it relates specifically to the SCSO's correctional facilities and to discuss what further steps, if any, the SCSO can take to prevent the spread of COVID-19. (ECF No. 27-1, ¶ 32).

Since the early implementation of the Jail's COVID-19 pre-booking screening process, no detainee has been allowed inside the Jail without first being questioned and screened by a nurse. (ECF No. 27-1, ¶ 18; ECF No. 99-1, PageID 1480). In addition to conducting the COVID-19 evaluation, which includes questioning the detainee and taking the detainee's body temperature, the nurse additionally assesses whether the detainee suffers from a chronic condition. (ECF No. 27-1, ¶ 18; ECF No. 99-1, PageID 1481, 1509, 1548; ECF No. 111, PageID 2115). Medical personnel at the Jail additionally identify detainees suffering from previously-undetected, unreported, and/or untreated chronic medical conditions during the subsequent medical evaluation

that occurs within fourteen days of booking and/or when detainees are treated for other ailments or conditions. (ECF No. 99-1, PageID 1509-1510; ECF No. 111, PageID 2122). After identifying those detainees with chronic conditions, medical personnel attempt, if safety and security issues permit, to house the detainees with chronic conditions on and/or in close proximity to the medical department, which limits their movement and contact with other individuals within the facility. (ECF No. 99-1, PageID 1506-1507).

All inmates, including those that suffer from chronic conditions, have access to medical care and can request medical care at any time. (ECF No. 27-1, ¶ 27; ECF No. 108, PageID 1999). Additionally, members of the medical staff, as well as the jail staff, present to the detainees' housing units each day. (ECF No. 108, PageID 1999). Further, a nursing team remains at the Jail to evaluate and treat detainees twenty-four hours a day, seven days a week. (ECF No. 99-1, PageID 1466). Any detainee that exhibits symptoms of COVID-19 is evaluated by the registered nurse that manages infection control at the Jail. (ECF No. 99-1, PageID 1460-61). Notably, inmates are not charged for medical examination if they raise concerns that they are suffering from COVID-related symptoms. (ECF No. 27-1, ¶ 27; ECF No. 99-1, PageID 1469-70; ECF No. 111, PageID 2115).

Notwithstanding, the Shelby County Sheriff's Office Expeditor, Mischelle Best ("Best"), is  routinely notified by medical staff and/or security personnel at the Jail of new arrestees and current detainees that may be at a higher risk for severe illness if they contract COVID-19 due to their age, underlying medical condition(s), and/or other factors. (ECF No. 100-1, ¶ 4). Best then regularly communicates the information that she receives concerning said detainees and their respective issues to the local District Attorney's Office, the local Public Defender's Office, private criminal defense attorneys, and the Courts. In doing so, her goal is to facilitate the release of said detainee(s) from the Shelby County Jail or to progress their cases as quickly as possible. (ECF No.

100-1, ¶ 4). Specifically, in conjunction with the Jail, the District Attorney's Office has focused "on safely and reasonably and responsibly doing anything and everything [the Office] can to reduce the jail population." (ECF No. 111, PageID 2115). In doing so, the Office has focused on "60 and older inmates," "low level D and E felonies," and "detainees who have a medical vulnerability to COVID-19." (ECF No. 111, PageID 2205).

### d. Evolving Measures to Promote Social Distancing and to Combat the Spread of COVID-19

Petitioners allegations that "social distancing is impossible," is not supported by the record. The Jail has taken numerous measures to encourage allow for social distancing. Courts faced with similar contentions have acknowledged that the COVID-19 pandemic "poses particularly acute challenges for the administration of the country's jails and prisons…[b]ecause incarcerated inmates are necessarily confined in close quarters." *Swain v. Junior*, 2020 U.S. App. LEXIS 18689, *2 (11th Cir. June 15, 2020). However, based upon ever-changing guidance and principles concerning COVID-19 from health and correctional officials, as well as upon the recommendations tendered by Mr. Brady, the Jail has undertaken numerous efforts to combat and prevent the spread of COVID-19 and to protect all detainees incarcerated within the Jail, including those identified as "medically vulnerable" by the CDC, despite the necessary constraints on detainees.

For instance, all in-person visitation and non-essential vendor access to the Jail has been suspended, movement throughout the Jail has been constricted, and group gatherings have been prohibited. (ECF No. 27-1, ¶¶ 23, 25; ECF No. 111, PageID 2154-55). In addition to the measures taken within the tunnel area outlined above, officers have also placed six-foot markings throughout the housing units, including the areas containing telephones and kiosks within the facility, and detainees are constantly educated on general CDC guidelines concerning social distancing and

other best practices to prevent the spread of COVID-19 via officers, guidance posters modified to present instructions on a sixth-grade reading level, and an informative video. (ECF No. 27-1, ¶¶ 20, 22; ECF No. 111, PageID 2141-42, 2153, 2159-60). When serving meals within the Jail, only three cells are let out at a time, and detainees are permitted to eat inside their own cell. (ECF No. 111, PageID 2153, 2163). Likewise, during the pill call process, detainees are summoned one at a time instead of instructed to wait in lines (ECF No. 99-1, PageID 1481-83), and most routine medical visits with detainees occur at the detainees' housing units. (ECF No. 111, PageID 2116).

Moreover, all detainees are provided with at least two facial masks, which are regularly laundered, and all staff and detainees are required to wear their masks while in the facility. (ECF No. 27-1, ¶ 20; ECF No. 111, PageID 2145-46). Staff who observe an inmate not properly wearing a mask immediately instruct the inmate to put his facial mask on, and any staff members who fail to properly wear a facial mask are subject to disciplinary action. (ECF No. 27-1, ¶ 26; ECF No. 111, PageID 2145-46).

Additionally, officers within the Jail have been provided materials concerning the recognition of COVID-19 symptoms and have been trained on the Jail's recently-implemented cleaning practices. (ECF No. 111, PageID 2160). While detainees are provided cleaning supplies for disinfecting their common areas, their individual cells, and "high touch areas," such as phones, kiosks, and showers, officers disinfect every surface throughout the Jail daily. (ECF No. 27-1, ¶ 28; ECF No. 111, PageID 2146-48, 2152-53). In order to do so, the Jail has purchased additional commercial cleaning equipment, which is used to disinfect the facility including the housing units and the tunnel between the Jail and the criminal courts, as well as 550 additional mop heads and implemented a new mop head replacement schedule. (ECF No. 27-1, ¶ 28; ECF No. 111, PageID 2148-49, 2152-53).

Furthermore, all inmates are granted access to hand soap and other hygiene products free of charge. (ECF No. 27-1, ¶ 29). Pursuant to the Jail's current directive, each detainee is provided two free bars of soap each week. (ECF No. 111, PageID 2144). The Jail also provides inmates access to disposable gloves in further effort to prevent the spread. (ECF No. 27-1, ¶ 30).

### D.   A TEMPORARY RESTRAINING ORDER IS NOT WARRANTED.

Plaintiffs have failed to meet their burden by clear and convincing evidence to justify their requested relief of release. *See Cameron v. Bouchard*, 2020 U.S. App. LEXIS 21480, *10 (6th Cir. July 9, 2020) ("[T]he party seeking a preliminary injunction bears the burden of justifying such relief.").

#### a.   *Failure to Establish Likelihood of Success on the Merits*

"[A] court must not issue a preliminary injunction where the movant presents no likelihood of merits success." *Cameron*, 2020 U.S. App. LEXIS 21480 at *21. The party seeking the injunction must establish its case by clear and convincing evidence. *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968). Courts may only grant the extraordinary remedy of a preliminary injunction when the movant carries his burden of persuasion. *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir. 2000).

> i.    *Petitioners cannot succeed on the merits because the Shelby County Sheriff's Office has not acted with deliberate indifference or reckless disregard.*

Petitioners continue to assert that they can show that their confinement is unconstitutional by only providing evidence that their confinement is not "objectively reasonable." As already briefed by Respondents, the Sixth Circuit has found differently. *See Cameron*, 2020 U.S. App. LEXIS 21480 at *15-16 (holding that a petitioner must show that the respondent acted with at least "reckless disregard," if not, "deliberate indifference" in proving a Fourteenth Amendment due

process violation).

Notwithstanding, even under Petitioners' theory, they have failed to show a likelihood of success on the merits. Petitioners argue that they can prove they are being "punished" in violation of the Fourteenth Amendment by merely showing "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." (ECF No. 114, PageID 2376). Here, Petitioners allege that the mere *threat* of contracting COVID-19 constitutes "punishment." They have not proven (1) that COVID-19 is rampant in the Jail, (2) that they will contract it, or (3) that if they do, they will suffer serious complications. They merely assume those things. Mere assumptions do not constitute "objective evidence" that their current confinement constitutes "punishment" in violation of their Fourteenth Amendment rights. Additionally, as acknowledged by Petitioners, Respondents possess the interest of preventing a credible risk of flight as well as to prevent a credible, serious risk to public safety. (ECF No. 114, PageID 2376). Here, the only proof in the record supports Respondents' strong interest in detaining the named petitioners and members of the class. The members of the class are being held on significant charges and/or have significant criminal histories. (ECF No. 111, PageID 2217-20). The named Petitioners themselves have lengthy criminal histories, and some have engaged in criminal activity and missed court dates while on bond. (ECF No. 111, PageID 2214-15). Thus, based upon the evidence before the Court, even under Petitioners' "unconstitutional punishment" theory, Petitioners have not shown a likelihood of success on the merits.

ii.    *Petitioners are unlikely to succeed on the merits because they have not proven the "fact" of their confinement is unconstitutional.*

Petitioners rely heavily on Dr. Venters to assert that that *no* conditions in the Shelby County Jail would render their detention constitutional in light of COVID-19. Importantly, Dr. Venters'

unsupported theory that COVID-19 is traveling from pod to pod due to "open bars" serves as his only basis to conclude the Jail "cannot" be made safe for the class and subclass members. Despite his best efforts to contrive a reason for this Court to grant release by claiming the physical aspects of the Jail cannot be changed, the majority of his supposed criticisms *can be remedied*. (ECF No. 103-1, PageID 1651-52.) Again, as noted in *Wilson*, Petitioners' request for release is only justified if the *fact* of confinement is unlawful. *Wilson v. Williams*, 2020 U.S. App. LEXIS 18087, *15 (6th Cir. June 9, 2020).  For the *fact* of confinement to be unlawful, the condition complained of must be *impossible* to remedy. *Id.* Here again, the proof reveals that Petitioners cannot support their request for temporary restraining order because their complaints relate to remedial conditions of the Jail, not the *fact* of their confinement.

        iii.     *Petitioners are unlikely to succeed on the merits of their Americans with Disabilities Act and Rehabilitation Act claims.*

In attempting to justify their ADA and RA claims via a petition for writ of habeas corpus, Petitioners rely upon a two-decade old Ninth Circuit case. *See Bogovich v. Sandoval*, 189 F.3d 999 (9th Cir. 1999). *Bogovich* does not support Petitioners' assertions that they can assert claims under the ADA/RA via their petition for writ of habeas corpus. In *Bogovich*, the question before the Court was whether the petitioners' claims should have been brought via a petition for writ of habeas corpus when they claimed the Board of Prison Terms' consideration of prisoners' past substance abuse history as part of its parole decisions violated the ADA. *Id.* at 1001. The Court found that such claims did not have to be brought by a petition for writ of habeas corpus because they did not "imply the invalidity of their continuing confinement." *Id.* at 1004. Importantly, *Bogovich* did not hold that a claim related to a jail failing to provide reasonable accommodations could be brought via a petition for writ of habeas corpus.

As previously briefed by respondents, an ADA claim assumes there are reasonable

accommodations that a Jail should make, but is not making, to "avoid discrimination on the basis

of disability." 28 C.F.R. § 35.130(b)(7); s*ee also* ECF No. 114, PageID 2382-83. A "public entity"

must only make "reasonable modifications," and must not do so if the "public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service,

program, or activity." 28 C.F.R. § 35.130(b)(7). Here, to the extent Petitioners' demand

Respondents implement "modifications" which they have not already implemented, such a

demand relates to *remedial conditions*, not the *fact* of confinement, and thus are not appropriately

asserted via a petition for writ of habeas corpus. To the extent Petitioners request release, such a

request would undoubtedly fundamentally alter the nature of Respondents' jail services and

therefore is an inappropriate request for accommodation pursuant to the ADA. Thus, under either

avenue, Petitioners ADA/RA claims are inappropriate, and Petitioners have not shown a likelihood

of success on the merits.

### b.      *Failure to Establish Irreparable Harm*

"The inquiry isn't whether the plaintiffs have shown that the virus poses a danger to the

inmates in the abstract—it undoubtedly does—but rather whether they have shown that they will

suffer irreparable injury unless the injunction issues." *Swain*, 2020 U.S. App. LEXIS 18689 at *33.

Here, the Jail has had no detainee deaths resulting from COVID-19, and only two detainees have

required hospitalization due to COVID-19-related complications. (ECF No. 99-1, PageID 1493).

Petitioners' repeated conclusory assumption that they will suffer "loss of health or life" if the Court

does not grant them release is unfounded. To the contrary, Robert Pigram, the only individual that

has provided testimony concerning actual contraction of COVID-19, confirmed that he did not

have to be hospitalized due to his illness, is no longer experiencing symptoms related to COVID-

19, and did not pass the virus to his cellmate. (ECF No. 108, PageID 1999, 2001). Accordingly,

Petitioners have failed to show actual and imminent, *not speculative or unsubstantiated*, harm. *See*

*Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

    **c.**   ***Likelihood to Cause Substantial Harm to Others and Detriment to the Public Interest***

   The requested release of detainees, with no regard for their risk to society upon release,

would be detrimental to the public interest and could cause harm to others. Based upon the actions

taken by the Shelby County Sheriff's Office, the District Attorney's Office, the Public Defender's

Office, private criminal defense attorneys, local law enforcement, and the Courts, the population

in the Jail has significantly declined since the initial COVID-19 outbreak. (ECF No. 27-1, ¶ 37;

ECF No. 101-2; ECF No. 111, PageID 2126). As explained by District Attorney General Amy P.

Weirich, "if you are currently in jail at 201 Poplar, it's because you have murdered, raped, robbed,

kidnapped. You might be here for what some would call a low level case, but it's because your

record is long." (ECF No. 111, PageID 2216-17).

   Moreover, in demanding release, Petitioners have failed to overcome the steep hurdle set

by "the well-established rule that the Government has traditionally been granted the widest latitude

in the 'dispatch of its own internal affairs.'" *Rizzo v. Goode*, 423 U.S. 362 (1976). To that extent,

Courts must accord prison administrators "wide-ranging deference in the adoption and execution

of policies and practices." *Ward v. Dyke*, 58 F.3d 271, 273 (6th Cir. 1995). Here, Petitioners are

requesting this Court to assume the role of "super-warden" and to disregard the widespread efforts

taken by Shelby County, Tennessee, the Sheriff's Office, and the local state judicial officers. Said

intervention is unnecessary, would be detrimental to the public's interest in allowing the State of

Tennessee and local county officials to administer their own corrections facilities, and would

duplicate the state law remedies available to Petitioners. (ECF No. 78; ECF No. 111, PageID 2233-

35; ECF Nos. 118, 118-1).

## **CONCLUSION**

Based upon the above, upon Respondents-Defendants' Proposed Findings of Fact and

Conclusions of Law (ECF No. 112), upon the record as a whole, this Court should enter an order

denying Petitioners' Motion for Temporary Restraining Order (ECF No. 2).

Respectfully submitted,

**PENTECOST, GLENN & MAULDIN, PLLC**

By:  s/J. Austin Stokes
     James I. Pentecost (#11640)
     Nathan D. Tilly (#31318)
     J. Austin Stokes (#31308)
     162 Murray Guard Drive, Suite B
     Jackson, Tennessee 38305
     (731) 668-5995

     AND

     Marlinee C. Iverson (#18591)
     Bridgett L. Stigger (#29415)
     Shelby County Attorney's Office
     160 North Main Street, Suite 950
     Memphis, TN 38103
     (901) 222-2100

     *Attorneys for Respondents-Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served via ECF filing system, upon the following:

Jeffery P. Robinson
Amreeta Mathai
Andrea Woods
ACLU
125 Broad Street
New York, NY  10004

Brice Moffatt Timmons
Black, Mclaren, Jones, Ryland & Griffee, P.C.
530 Oak Court Drive, Ste. 360
Memphis, TN  38117

Thomas Hauser Castelli
Stella Marie Yarbrough
ACLU
210 25th Avenue N.
P.O. Box 120160
Nashville, TN 37212

Maria Morris
ACLU
National Prison Project
915 15th St. NW
Ste 7th Floor
Washington, DC 20005

Jonathan Silberstein-Loeb
Edward Robinson, Jr
Meredith Borner
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, NY  10019

Zoe Brennan-Krohn
ACLU
39 Drumm Street
San Francisco, CA 94111

Joshua B. Spickler
JUST CITY
902 South Cooper
Memphis, TN 38104

Jeffery P. Robinson
ACLU
810 Third Avenue
Suite 500
Seattle, WA 10004

on or before the filing date thereof.

DATE:  This the day 20th of July, 2020.

By:    s/J. Austin Stokes
       James I. Pentecost
       Nathan D. Tilly
       J. Austin Stokes