# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| Favian Busby, Michael Edgington, Russell Leaks, and Joseph Nelson, *on their own behalf and on behalf of those similarly situated*; <br><br> Petitioners-Plaintiffs, <br><br> v. <br><br> Floyd Bonner, Jr., *in his official capacity*, Shelby County Sheriff, and the Shelby County Sheriff's Office, <br><br> Respondents-Defendants. | Case No. 20-cv-2359-SHL-atc |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES FOR ENFORCEMENT WORK

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ................................................................................. 1

**FACTUAL BACKGROUND** ....................................................................................... 3

    A.   Procedural History .......................................................................................... 4

    B.   Terms of the Consent Decree ......................................................................... 7

**ARGUMENT** .............................................................................................................. 8

  I.   Plaintiffs Are Entitled to Attorneys' Fees Because They Are the Prevailing Party. .......... 8

  II.   Plaintiffs' Requests for Attorneys' Fees Are Reasonable ................................... 11

    A.   Plaintiffs Have Fairly Calculated the Lodestar Amount ............................. 11

        1.   Plaintiffs Claim a Reasonable Number of Hours .................................. 11

        2.   Counsel Seek Reasonable Rates for Their Work in This Case. ............... 14

    B.   The *Johnson* Factors Support an Award of the Full Lodestar ...................... 19

        1.   The Time and Labor Required. ............................................................... 19

        2.   The Novelty and Difficulty of the Questions. ........................................ 20

        3.   The Skills Requisite to Perform the Legal Service Properly ................. 21

        4.   The Preclusion of Other Employment Due to Accepting the Case ......... 22

        5.   The Customary Fee. ................................................................................ 22

        6.   Whether the Fee Is Fixed or Contingent ................................................ 22

        7.   Time Limitations Imposed by the Client or the Circumstances ............. 23

        8.   The Amount Involved and the Results Obtained .................................... 23

        9.   The Experience, Reputation, and Ability of the Attorneys. .................... 25

        10.   The "Undesirability" of the Case. ........................................................... 26

        11.   The Nature and Length of the Professional Relationship with the Client. ........... 28

        12.   Awards in Similar Cases. ........................................................................ 29

**CONCLUSION** ........................................................................................................ **31**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adcock–Ladd v. Sec'y of Treasury*,
   227 F.3d 343 (6th Cir. 2000) ...........................................................23, 24

*Alberti v. Klevenhagen*,
   903 F.2d 352 (5th Cir. 1990) (per curiam)...............................................27

*Armstrong v. Davis*,
   318 F.3d 965 (9th Cir. 2003) ...........................................................15, 17

*Barnard v. Piedmont Reg'l Jail Auth.*,
   No. CIV.A. 3:07CV566, 2009 WL 3416228 (E.D. Va. Oct. 21, 2009)..................27

*Beckford v. Irvin*,
   60 F. Supp. 2d 85 (W.D.N.Y. 1999) ........................................................16

*Binta B. v. Gordon*,
   710 F.3d 608 (6th Cir. 2013) ........................................................9, 10, 17

*Blum v. Stenson*,
   465 U.S. 886 (1984)....................................................................11, 21

*Bongo Prods., LLC v. Lawrence*,
   No. 3:21-cv-00490 (M.D. Tenn. Jun. 25, 2021) ...........................................30

*Braggs v. Dunn*,
   321 F.R.D. 653 (M.D. Ala. 2017) ...........................................................16

*Busby v. Bonner*,
   Docket No. 21-05853 (6th Cir. Dec. 14, 2022) ...........................................6

*CRST Van Expedited, Inc. v. E.E.O.C.*,
   578 U.S. 419 (2016)..........................................................................9

*Pennsylvania* v. *Del. Valley Citizens' Council for Clean Air*,
   478 U.S. 546 (1986)..........................................................................10

*Disabled Patriots of Am., Inc. v. Rsrv. Hotel, Ltd.*,
   659 F. Supp. 2d 877 (N.D. Ohio 2009).....................................................24

*El-Tabech v. Clarke*,
   No. 4:04CV3231, 2008 WL 1995304 (D. Neb. May 5, 2008) .............................28

*Farrar v. Hobby*,
  506 U.S. 103 (1992)..........................................................................................9

*Geier v. Sundquist*,
  372 F.3d 784 (6th Cir. 2004) ....................................................................17, 24

*Gillespie v. Brewer*,
  602 F. Supp. 218 (N.D.W. Va. 1985) ..............................................................27

*Gonter v. Hunt Valve Co.*,
  510 F.3d 610 (6th Cir. 2007) ..........................................................................17

*Graves v. Arpaio*,
  633 F. Supp. 2d 834 (D. Ariz. 2009) ....................................................27, 30, 31

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)..................................................................................11, 21

*Howard v. Tennessee*,
  No. 3:16-CV-2829, 2018 WL 10151080 ..........................................................29

*Hull v. Members of U.S. Gov't*,
  No. 1:12-CV-0203, 2012 WL 3541928 (M.D. Pa. Aug. 14, 2012) ....................16

*Isabel v. City of Memphis*,
  404 F.3d 404 (6th Cir. 2005) ....................................................................19, 23

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ................................................................. *passim*

*Martino v. Carey*,
  568 F. Supp. 848 (D. Or. 1983) ......................................................................27

*Morales Feliciano v. Hernandez Colon*,
  697 F. Supp. 51 (D.P.R. 1988)........................................................................27

*Prison Legal News v. Inch*,
  411 F. Supp. 3d 1198 (N.D. Fla. 2019)............................................................30

*Ruiz v. Estelle*,
  553 F. Supp. 567 (S.D. Tex. 1982) ..................................................................27

*Tenn. State Conf. of the NAACP v. Hargett*,
  No. 3:19-cv-00365 (M.D. Tenn. May 2, 2019) ................................................30

*Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*,
  489 U.S. 782 (1989)..........................................................................................9

**Statutes**

29 U.S.C. § 794 ................................................................................................ *passim*

42 U.S.C. § 1988 ...................................................................................... 1, 8, 16

42 U.S.C. § 1997e .................................................................................... 1, 8, 16

42 U.S.C. § 12131 .............................................................................. 4, 15, 16, 17

42 U.S.C. § 12205 .................................................................................... 1, 8, 15

Tenn. Code Ann. § 54.1 ..................................................................................... 1

**Other Authorities**

CJA Compensation Rates, U.S. Dist. Ct., N.D. Cal.,
    *https://www.cand.uscourts.gov/about/court-programs/criminal-justice-act-
    cja/cja-compensation-rates/* ....................................................................... 16

Fed. R. Civ. P. 54(d)(2) ..................................................................................... 1

Jail & Inmate Information, SHELBY COUNTY SHERIFF'S OFFICE,
    https://www.shelby-sheriff.org/jail-inmate-information ........................... 24

*Track COVID-19 in Shelby County, Tenn.,* THE NEW YORK TIMES (Nov. 28,
    2023) ........................................................................................................ 3

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................................ 30

Pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 1997e(d), 42 U.S.C. § 12205, 29 U.S.C. § 794a(b), and Paragraph 23 of the Consent Decree approved by the Court in this action (ECF Nos. 161-2, 209), Plaintiffs,[1] by and through their undersigned counsel ("Class Counsel"), respectfully move the Court to award them attorneys' fees in the amount of $769,337.80 for compensable work done to enforce their rights under the Consent Decree.  This filing includes all the elements required by Rule 54(d)(2) of the Federal Rules of Civil Procedure and Western District of Tennessee Rule 54.1, and is timely, being filed in accordance with the Court's stay order, issued at Plaintiffs' request within 14 days after the Court's judgment.  (ECF No. 367 (October 17, 2023 Supplemental Judgment, retaining "jurisdiction to resolve any claims or disputes regarding attorneys' fees"); ECF No. 369 (October 30, 2023 Text-Only Order staying deadline to file motion for attorneys' fees)).

## PRELIMINARY STATEMENT

As the prevailing party in this civil rights litigation, Plaintiffs are entitled to their attorneys' fees.  As part of the Consent Decree (the "Decree"), the parties resolved the fees and costs up until the date of entry of the Decree and specifically provided that Plaintiffs could seek an award of fees and costs for work needed to enforce their rights under the Decree.  (ECF No. 161-2, ¶¶ 23, 30 ("If Plaintiffs seek enforcement of this Decree and obtain relief from the Court as a result of seeking such enforcement, Plaintiffs may seek an award of the reasonable attorneys' fees and costs incurred in seeking enforcement of this Decree.").)  Through this action, Plaintiffs negotiated and enforced a class action settlement agreement.  After being approved and entered by the Court as a Consent Decree (ECF Nos. 209, 210), the settlement achieved substantial benefits for the certified class of

---

[1]    Plaintiffs are the individually named persons and the Class for whom they serve as representatives.

thousands of medically vulnerable and disabled people incarcerated at the Shelby County Jail (the "Jail"). As this Court found, "this relief [achieved by the Decree] addresses most, if not all, of Plaintiffs' alleged deficiencies in their confinement in the Jail, given the pandemic, and the Court is not aware of any greater successes in similar litigation." (ECF No. 162 at 6.)

Ensuring that the Decree's promises were fulfilled, however, required considerable efforts by Plaintiffs' attorneys. *One day* after the Decree was finally approved, Defendants issued a press release claiming that they would take no further action after offering one round of COVID-19 vaccines to detainees. (ECF No. 216-3.) Defendants' lackluster commitment to the Decree continued throughout its life span, necessitating two motions to enforce by Plaintiffs and extensive litigation that successfully defeated a premature effort to terminate the Decree by Defendants. (*See, e.g.*, ECF Nos. 216-1, 218, 222–23, 227-1, 244-45, 254–59, 274, 276, 303, 316, 337, 345.) To secure the benefits of the negotiated for Consent Decree, Plaintiffs—through their counsel— had to depose multiple Jail staff, prepare expert and lay witnesses, defend against an appeal to the Sixth Circuit, and meet and confer numerous times about Defendants' lack of fidelity to the Decree, particularly with respect to making best efforts to adopt the recommendations of the court-appointed Independent Inspectors on matters of the Jail's Expeditor, COVID-19 testing, and the vaccine program. (*See, e.g.*, ECF Nos. 238, 240, 248-2, 312-9, 318 (deposition notices and transcripts of various Jail staff), 337 (judgment of Sixth Circuit affirming the lower court's denial of the motion to terminate), 216-4, 244-1, 312-6 (email correspondence among counsel and Independent Inspectors regarding Jail conditions).) Plaintiffs are the prevailing parties in defeating Defendants' premature termination effort and in moving for enforcement of certain of the Decree's provisions.

Plaintiffs have filed with this motion detailed time invoices from the American Civil Liberties Union Foundation ("ACLU") and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") who serve as co-counsel to Plaintiffs.[2]  (*See* Ex. B to the Declaration of David Fathi ("Fathi Decl.") (detailing time invoices for the national ACLU); Ex. A to the Declaration of Ariane Rockoff-Kirk ("Rockoff-Kirk Decl.") (detailing time invoices for Paul, Weiss).)  In an exercise of billing judgment, Plaintiffs have reduced the rates and overall amount sought, and Plaintiffs are not seeking fees on this motion for more than 150 hours of compensable work performed by additional co-counsel the ACLU of Tennessee, Just City, and the Donati Law.  (*See* Declaration of Stella Yarbrough.)  Nor are Plaintiffs seeking expenses. The grounds for this motion are set forth below.

## FACTUAL BACKGROUND

This litigation arises from conditions at the Shelby County Jail during the COVID-19 pandemic.  In Shelby County, to date, at least 3,127 people[3] have died from COVID-19, and through the termination of the Consent Decree, the Jail reported—despite their insufficient testing program—that at least 460 people detained at the Shelby County Jail tested positive for COVID-19.[4]

---

[2]     Paul, Weiss is representing Plaintiffs on a *pro bono* basis, fully expecting to recover attorneys' fees if their clients prevail.  The Motion seeks recovery of fees for certain of the work that Paul, Weiss has performed in connection with the action, and Paul, Weiss, has committed to donate any of the fees it recovers in this action to non-profit legal services organizations.  (*See* Rockoff-Kirk Decl. ¶ 4.)

[3]     *Track COVID-19 in Shelby County, Tenn.,* THE NEW YORK TIMES (Nov. 28, 2023), https://www.nytimes.com/interactive/2023/us/shelby-tennessee-covid-cases.html.

[4]     Fathi Decl., Ex. C (Shelby County Jail report).

A.      **Procedural History**

On May 20, 2020, as the COVID-19 pandemic was raging, the individual Plaintiffs, for themselves and other putative Class Members[5] confined at the Shelby County Jail, filed a complaint and habeas corpus petition challenging the fact and conditions of their confinement. (ECF No. 1.)  Plaintiffs alleged violations of the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Rehabilitation Act").  The same day, Plaintiffs filed a Motion for a Temporary Restraining Order,[6] supported by three expert declarations and six people with knowledge of the Shelby County Jail's conditions as the pandemic spread.  (ECF Nos. 2–2-9.)  On June 10, 2020, this Court certified a Class and Subclass of medically vulnerable and disabled individuals detained pre-trial at the Jail who were, based on guidance from the Centers for Disease Control and Prevention ("CDC"), at increased risk of serious complications or death from COVID-19.  (ECF No. 38 at 11, 17–18.)  On August 7, 2020, the Court denied Plaintiffs' emergency motion for habeas relief but expressed significant concerns about whether medically vulnerable and disabled detainees were in fact safe from COVID-19 in the facility.  (ECF No. 124 at 1, 3, 6, 19–21.)  In its opinion, this Court outlined multiple "grave areas of concern" and expressed "doubts . . . as to whether the conditions at the Jail are legally sufficient."  (*Id.* at 19–20.)  In particular, this Court wrote that "[c]oncerns persist as to the lack of testing, social distancing, and isolation and quarantine measures at the Jail, not to mention the persistent failure to consider detainees' medical conditions when making bond decisions."  (*Id.* at 21.)

---

[5]      The certified class included all people housed in the Jail who met one of several specified conditions in conformity with CDC guidelines.  (ECF No. 38 at 12.)

[6]      This motion was ultimately treated as a motion for preliminary injunction.  (ECF No. 124 at 1 n.1.)

Following extensive negotiations, Plaintiffs and Defendants Floyd Bonner, Jr., in his official capacity as the Shelby County Sheriff, and the Shelby County Sheriff's Office entered into a class-wide settlement agreement and moved the Court for preliminary approval of the Settlement on January 22, 2021. (ECF No. 161.)

On January 28, 2021, the Court preliminarily approved the parties' settlement and Proposed Consent Decree. (ECF No. 162.) In so doing, the Court emphasized that the Proposed Consent Decree "imposes multiple protective measures for Plaintiffs moving forward, which were the focus of this litigation from the beginning" (*id.* at 5) and that the Proposed Consent Decree resolved "pressing concerns regarding the adequacy of safety measures at the Jail" in the face of the "unprecedented crisis in need of urgent resolution" presented by COVID-19. (*Id.* at 7.) After class notice and a fairness hearing, the Court granted final approval of the settlement on April 12, 2021. (ECF No. 209.)

Just *one day* after the Consent Decree (the "Decree") was finally approved, on April 13, 2021, the Shelby County Sheriff's Office issued a press release claiming that they would take no further action after offering one round of COVID-19 vaccines to detainees, stating that this was "the final action to be taken pursuant to the Consent Decree." (ECF No. 216-3.) This foreshadowed Defendants' continued lackluster commitment to the Decree, which in turn required Plaintiffs to closely monitor Defendants' compliance with the Decree, including through conversations and liaison with the Independent Inspectors appointed by the Court to conduct Jail visits, bringing two separate motions to enforce, and successfully litigating Defendants' premature efforts to terminate the Decree, including on appeal in the Sixth Circuit. (*See, e.g.*, ECF Nos. 216-1, 216-4, 218, 222–23, 227-1, 244–45, 254–59, 274, 276, 303, 312-6, 316, 337, 345.) In connection with these efforts, Plaintiffs expended extensive time and effort to closely scrutinize

the Independent Inspectors' reports and documentation from Defendants and to meet and confer about Defendants' noncompliance on matters of the Jail Expeditor, testing, and the vaccine program. (*See, e.g.*, ECF No. 216-4, 216-5. 216-9, 216-13.) Plaintiffs uncovered substantial violations of the Consent Decree and, without the cooperation of Defendants on many of them, were required to pursue enforcement action to bring Defendants into compliance.

On May 19, 2021, Plaintiffs moved to enforce portions of the Consent Decree as part of a larger motion to enforce and modify the Decree. (ECF No. 216-2 at 3–4.)

On June 2, 2021, less than two months after the Decree was finally approved, Defendants moved to terminate the Decree. (ECF No. 218.) The court held two sessions of an evidentiary hearing on the termination motion, at which Plaintiffs examined Defendants' witness Chief Jailer Kirk Fields, and Plaintiffs presented five witnesses including then-Independent Inspector Mike Brady. (ECF Nos. 246, 249.) Following the hearing, Plaintiffs submitted a post-hearing brief. (ECF No. 254.) On August 30, 2021, the Court denied Defendants' termination motion (ECF No. 258), and Defendants appealed. (ECF No. 259.)

On November 4, 2021, the Court bifurcated Plaintiffs' Motion to Enforce and Modify the Consent Decree, and held the modification portion of the motion in abeyance pending decision on Defendants' appeal of the Court's decision denying their motion to terminate. (ECF No. 276.) The Court held a hearing on the Motion to Enforce, and granted the motion in part on March 30, 2022. (ECF No. 316.)

In December 2022, The Sixth Circuit denied Defendants' appeal of the termination motion. (Op., ECF No. 34-1, *Busby v. Bonner,* Docket No. 21-05853 (6th Cir. Dec. 14, 2022).) The Sixth Circuit opinion was filed in this Court. (ECF No. 337.)

B.        Terms of the Consent Decree

The Consent Decree required that Defendants implement adequate procedures to both protect Class Members from contracting COVID-19 and care for Class Members who become infected. (*See, e.g.,* ECF No. 161-2 ¶¶ 14–20.) The Decree required that a court-appointed Independent Inspector conduct independent inspections and prepare reports about the COVID-19 conditions and practices in the Jail, including meeting with the Jail's Expeditor regarding evaluation of Class Members for release and efforts to expedite releases (*id.* at ¶¶ 4–11), that Defendants submit proof of satisfactory ventilation and air quality in the Jail (*id.* at ¶ 13), that Defendants provide adequate COVID-19 testing, isolation and quarantine procedures for Jail detainees and staff (*id.* at ¶¶ 14–18), and provide detainees with proper personal protective equipment, including cleaning materials and surgical or cloth masks (*id.* at ¶ 19), and that Defendants maximize social distancing including through the Expeditor's efforts to reduce the Jail population (*id.* at ¶ 20). The Consent Decree contemplated compliance with evolving guidance from the CDC, the Shelby County Health Department, and the Tennessee Department of Health. (*Id.* at ¶¶ 16, 19–20.)

The Consent Decree states that Plaintiffs may seek attorneys' fees and expenses associated with enforcing the Decree. Paragraph 23 provides that "If Plaintiffs seek enforcement of this Decree and obtain relief from the Court as a result of seeking such enforcement, Plaintiffs may seek an award of the *reasonable attorneys' fees and costs* incurred in seeking enforcement of this Decree." (ECF No. 161-2 ¶ 23 (emphasis added).) Therefore, Paragraph 23 applies to Plaintiffs' successful efforts in obtaining an order of enforcement (ECF Nos. 216, 316) and successful efforts in defeating Defendants' motion to terminate the decree. (ECF Nos. 258, 337.)

Counsel for Plaintiffs wrote to Defendants by email on October 13, 2023 describing the basis for attorneys' fees and attaching Plaintiffs' detailed fees and expenses schedules for the

period from April 13, 2021 (the date on which the settlement was approved) to March 30, 2022 (the date of the order granting, in part, the motion to enforce), offering to settle the issue of fees without litigation. On October 20, 2023, Defendants' counsel expressed the reasons why they believed a motion for fees would be improper and offered to meet and confer. Counsel conferred on October 24, 2023, where Defendants stated that they would consider Plaintiffs' position and provide a counteroffer, and did so again on October 26, 2023. The next day, Plaintiffs informed Defendants that they planned to seek an extension of time to file the fee application with the Court, as the parties were negotiating and the deadline would otherwise be October 31, 2023. Defendants objected on the basis that the motion would be untimely. Plaintiffs filed their Motion for Extension of Time on October 27, 2023 seeking an additional 45 days to continue their efforts to negotiate a resolution on attorneys' fees. (ECF No. 368 at 1.) The Court granted a stay of the deadline to file the fee motion. (ECF No. 369.) On October 30, 2023, Defendants, still having not presented a counteroffer, informed Plaintiffs that they also intended to file a motion for attorneys' fees unless Plaintiffs "agree to everyone just walking away." (*See* Ex. D to Fathi Decl.) In response, Plaintiffs declined to "walk away" but informed Defendants that they remain amenable to considering a counteroffer. *Id.* As the parties have failed to reach a resolution on the attorneys' fees and costs to which Plaintiffs are entitled for their enforcement work, this motion became necessary.

## ARGUMENT

### I.    PLAINTIFFS ARE ENTITLED TO ATTORNEYS' FEES BECAUSE THEY ARE THE PREVAILING PARTY.

Plaintiffs are entitled to attorneys' fees and expenses relating to the enforcement measures because they are "the prevailing party" under 42 U.S.C. § 1988(b), 42 U.S.C. § 1997e(d), 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b). "[T]he touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *CRST Van Expedited, Inc.*

8

*v. E.E.O.C.*, 578 U.S. 419, 422 (2016) (internal quotations and citation omitted).  The Supreme Court has explained that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  *Farrar v. Hobby*, 506 U.S. 103, 109 (1992).

Similarly, "the prevailing party inquiry does not turn on the magnitude of the relief obtained."  *Farrar*, 506 U.S. at 112–14 (holding that even a nominal damage award is sufficient to confer prevailing party status); *Binta B. v. Gordon*, 710 F.3d 608, 620 (6th Cir. 2013).  Rather, "the degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all."  *Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 790 (1989) (emphasis omitted); *Binta B.*, 710 F.3d at 628 ("The most critical factor [] is the degree of success obtained") (internal quotation marks omitted)).  Thus, because Plaintiffs secured relief for the Class Members, they are the prevailing parties and are entitled to fees.  *See Garland*, 489 U.S. at 791–92.

Plaintiffs were successful on their constitutional and statutory claims on behalf of a class of thousands of people.  As detailed above, the Consent Decree required Defendants to implement life-saving measures related to COVID-19 detection and treatment.  And, as the Court has already found, the Consent Decree had a significant impact on Class Members by resolving concerns about the adequacy of the Jail's safety measures and imposing protective measures moving forward. (ECF No. 162 at 6.)  This is more than sufficient to constitute a "material alteration of the legal relationship of the parties," *CRST*, 578 U.S. at 422, that "achieve[d] some of the benefit the parties sought in bringing suit."  *Farrar*, 506 U.S. at 109.

The focus of this motion, however, is solely Plaintiffs' entitlement to attorneys' fees and costs for post-settlement "enforcement of th[e] Decree," as the Consent Decree provides.  (ECF

No. 161-2 at ¶ 23.)  Both the Supreme Court and the Sixth Circuit have held that Plaintiffs who successfully enforce a settlement, including by defending the Consent Decree, are entitled to compensation.  *See Pennsylvania* v. *Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 559 (1986); *Binta B.*, 710 F.3d at 626. Attorneys' fees are appropriate, when "any action by a plaintiff to defend or enforce a prior consent decree must be necessary to enforce the prior order and result in a subsequent court order . . . that at the very least secures plaintiffs' initial success in obtaining the consent decree."  *Binta B.*, 710 F.3d at 625 (internal quotations and marks omitted). To entitle plaintiffs to fees, such a court order must not be a "total loss" but can be a "limited" success.  *Id*. at 625–27.  Paragraph 23 of the Consent Decree itself provides for fees and expenses for Plaintiffs' enforcement work.  (ECF No. 161-2 ¶ 23.)

Here, Plaintiffs seek recovery of fees for their enforcement work following approval of the Decree, including their successful opposition to Defendants' premature and baseless motion to terminate and to Defendants' appeal of the denial of the motion to terminate the Decree and Plaintiffs' partially successful motion to enforce.  The time period for which Plaintiffs seek fees is from April 13, 2021 to March 30, 2022.  The starting point of Defendants' noncompliance with the Decree is the date on which the Sheriff declared unilaterally by press release that Defendants' obligations under the Decree were satisfied and the Decree was terminated.  The end point is the date on which the Court issued its enforcement order granting, in part, Plaintiffs' first motion to enforce.  (*See* ECF Nos. 216-3, 316.)

## II.    PLAINTIFFS' REQUESTS FOR ATTORNEYS' FEES ARE REASONABLE.

### A.    Plaintiffs Have Fairly Calculated the Lodestar Amount.

A reasonable attorneys' fee award "is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson,* 465 U.S. 886, 888 (1984).  The fee applicant bears the burden of producing satisfactory evidence that the requested rates are consistent with prevailing rates in the community for "similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Id*. at 895 n.11.  Fee applicants must exercise billing judgment in calculating a reasonable attorneys' fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) ("Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.").

Plaintiffs seek $769,337.80 in attorneys' fees for their work.  This total covers the work of Plaintiffs' counsel who are seeking fees on this motion from April 13, 2021 to March 30, 2022.  To present an extremely reasonable request, Plaintiffs have opted not to seek fees for a considerable number of additional hours worked on enforcement efforts by other counsel on this case.  (Fathi Decl. ¶ 13, Yarbrough Decl. ¶ 10, Rockoff-Kirk Decl. ¶ 18.)

### 1.    Plaintiffs Claim a Reasonable Number of Hours.

The number of hours claimed is reasonable in light of the complexity and urgency of this case and the scope of tasks performed by counsel, including preparing the motion to enforce, opposing the motion to terminate in briefings and at an evidentiary hearing, opposing Defendants' appeal of the unfavorable ruling, communicating with the Independent Inspector, Defendants, and Class Members to obtain real time information regarding conditions in the Jail, and undertaking substantial monitoring and interaction with Defendants in order to effectuate the protections of the Decree.  (Fathi Decl. ¶ 16.)  Plaintiffs' counsel have attached task-based, itemized statements of

the time expended by each of the lawyers and staff for whom Plaintiffs seek compensation. These statements show the date on which identified individual performed the services, the time they devoted to the task, and their description of the services provided. Plaintiffs' counsel have reviewed the itemized statements and verified that the time claimed was necessary and reasonable. (Fathi Decl. ¶ 11–12, Ex. B; Rockoff-Kirk Decl. ¶ 22, Ex. A.)

### a.    Process for Billing and Claiming Hours.

The hours for which Plaintiffs seek compensation are based on contemporaneous time records for each timekeeper. (Fathi Decl. ¶ 5; Rockoff-Kirk Decl. ¶ 22.) Plaintiffs' counsel reviewed their billing entries and corrected entry errors, such as misplaced decimal points and duplicate time entries. (Fathi Decl. ¶ 11; Rockoff-Kirk Decl. ¶ 22.) Plaintiffs' counsel then exercised billing judgment and deleted any entries that were arguably redundant, unnecessary, inefficient, inadequately documented, or otherwise unreasonable for an attorney to bill a client or opposing counsel in the exercise of good billing judgment. (Fathi Decl. ¶ 11; Rockoff-Kirk Decl. ¶ 22.) Counsel also assessed the entries for reasonableness and, in certain instances, reduced but never increased the hours spent on certain tasks. (Rockoff-Kirk Decl. ¶ 22.) In addition, Paul, Weiss is seeking a fee award only for a core set of attorneys (and excluding all other support staff) who devoted a minimum of 20 hours to the matter, resulting in hundreds of hours being excluded from the fee application. (Rockoff-Kirk Decl. ¶ 18.) Plaintiffs also are not seeking any fee award for more than 150 hours of attorney time spent on enforcement by co-counsel ACLU Foundation of Tennessee, Just City, and the Donati Law Firm. (Yarbrough Decl. ¶ 10; Fathi Decl. ¶ 13.) After the exercise of billing judgment, Plaintiffs request compensation for the remaining 1,318.8 hours. These hours are fully justified as reasonable and necessary to the successful enforcement litigation in this case on behalf of the Plaintiff Class. (Fathi Decl. ¶ 11; Rockoff-Kirk Decl. ¶ 22.) Given the significant reduction of billed hours by Plaintiffs' counsel in exercising their billing judgment,

the Court need not further reduce the number of compensated hours.

This case has been efficiently staffed, as explained *infra* in Part II.B.1.  All of the attorneys and paralegals for whom fees are sought here are highly competent and qualified, and their services were vital to Plaintiffs' successful enforcement efforts.  (Fathi Decl. ¶ 14; Rockoff-Kirk Decl. ¶¶ 7–17.)   In particular, there was great staffing efficiency in having Andrea Woods and then Nancy Rosenbloom serve as Plaintiffs' lead or co-lead counsel.  Ms. Rosenbloom has decades of experience in class action lawsuits representing incarcerated adults and children, and Ms. Woods has been engaged for seven years full time litigating on criminal justice reform issues.  (Fathi Decl. ¶ 15.) Ms. Woods co-led the successful settlement negotiations that resolved Plaintiffs' claims, which allowed other counsel to focus on litigation tasks and client communications that were vital both to guide negotiations and to moving the litigation forward if negotiations had failed.  (Fathi Decl. ¶¶ 6, 15.)  After joining the litigation team in May 2021, Ms. Rosenbloom served as a lead counsel.

Given the size and complexity of this case (the Jail incarcerates, on average, more than 2,000 people on a given day and the population is largely pre-trial and thus constantly shifting), there were regularly scheduled weekly team meetings for which counsel also seek fees.  (Fathi Decl. ¶ 6, 16, Ex. C (Email from N. Tilly with Jail report).)  Regular meetings involving the litigation team were essential to the efficient management of the case, as the pace of counsel's work required close coordination.  This was necessary given the life-threatening risks the Class Members faced daily from COVID-19 while detained.  All multi-person meetings involving Plaintiffs' counsel were necessary for the timely sharing and discussion of critical information, revising strategy as required by developments in the case, and updating of tasks and assignments, which required frequent modifications to accommodate the demands of the compressed schedule

13

required by the claims in this case.  (Fathi Decl. ¶ 16.)  In its exercise of billing judgment, Paul, Weiss is seeking fees for only one Paul, Weiss attorney who participated in these regular team meetings, even where multiple Paul, Weiss attorneys' attendance was necessary in order to coordinate with the full team.  (Rockoff-Kirk Decl. ¶ 22.)

The hours claimed are reasonable in light of the tasks involved and the complexity of the case.  As discussed in the *Johnson* factors analysis, *infra* Part II.B., the issues in this case are both legally and factually complex, and the number of hours Plaintiffs' counsel devoted to them is reasonable.

**2.      Counsel Seek Reasonable Rates for Their Work in This Case**.

Plaintiffs seek attorneys' fees based on the market rates in New York and Washington D.C., where the offices of Plaintiffs' counsel seeking fees are located.  (Plaintiffs do not seek fees for the work of ACLU of Tennessee staff, whose office is located in Nashville, or for Donati Law and Just city, located in Memphis.)  However, rather than seeking the actual rates charged by lawyers of comparable skill in New York and Washington, Plaintiffs are seeking substantially reduced rates as set forth in the Fitzpatrick Matrix for the District of Columbia for Complex Federal Litigation, published by the U.S. Attorney's Office for the District of Columbia.  (Fathi Decl. ¶ 17–19.)  These are the rates sought by U.S. Department of Justice lawyers in complex civil rights litigation, and are considered to be below market rates.  The rates sought by Plaintiffs for each lawyer and paralegal based on the Fitzpatrick Matrix (2022 rates), along with their year of law school graduation are summarized in the tables below.

**Table 1:  List of Attorneys, Years of Graduation, and Market Rates Requested by Plaintiffs**

**ACLU Personnel**

| Lawyer or Paralegal | Year of Graduation (if lawyer) | Rate ($/hr) |
|---|---|---|
| Andrea Woods | 2014 | 563.00 |

| Maria Morris | 2001 | 699.00 |
| David Fathi | 1988 | 758.00 |
| Aditi Shah | 2020 | 473.00 |
| Samantha Weaver | Paralegal | 207.00 |
| Jessica Carns | Paralegal | 207.00 |
| Jennifer Wedekind | 2011 | 601.00 |
| Nancy Rosenbloom | 1987 | 760.00 |

**Paul, Weiss Personnel**

| Lawyer or Paralegal | Year of Graduation | Rate ($/hr) |
| --- | --- | --- |
| Joseph Bial | 2001 | 699.00 |
| Darren Johnson | 2001 | 699.00 |
| Meredith Borner | 2012 | 589.00 |
| Makiko Hiromi | 2012 | 589.00 |
| David Kimball-Stanley | 2018 | 505.00 |
| Eric Abrams | 2019 | 490.00 |
| Colleen Anderson | 2021 | 457.00 |
| James Mandilk | 2017 | 521.00 |
| Ariane Rockoff-Kirk | 2016 | 535.00 |

    **a. Plaintiffs Are Entitled to Attorneys' Fees at Market Rates**.

Plaintiffs' fee request is made based on their claims under the ADA (42 U.S.C. § 12205) and the Rehabilitation Act (29 U.S.C. § 794a) on behalf of the certified subclass members—which include most members of the larger class. Work on such claims is properly compensated at market rates; ADA and Rehabilitation Act claims are not subject to the Prison Litigation Reform Act ("PLRA") rate cap. *See Armstrong v. Davis*, 318 F.3d 965, 974 (9th Cir. 2003) (holding that PLRA capped rate does not apply to fees awarded under the ADA or the Rehabilitation Act attorneys' fee provisions); *Braggs v. Dunn*, 321 F.R.D. 653, 676 (M.D. Ala. 2017) (noting that fees sought pursuant to fee provisions in the ADA and the Rehabilitation Act are "not limited by the PLRA's

restrictions on attorneys' fees").

The PLRA caps the hourly rate only for attorneys' fee awards authorized under 42 U.S.C. § 1988 for actions brought by incarcerated people.[7] *Beckford v. Irvin,* 60 F. Supp. 2d 85, 88 (W.D.N.Y. 1999) ("The PLRA does not limit the award of attorney's fees to a prevailing plaintiff whose award is authorized under a statute separate from § 1988."); *Braggs,* 321 F.R.D. at 676 (noting that the PLRA hourly rate restrictions "apply only to cases in which the attorneys' fees are authorized under 42 U.S.C. § 1988"); *Hull v. Members of U.S. Gov't,* No. 1:12-CV-0203, 2012 WL 3541928, at *4 (M.D. Pa. Aug. 14, 2012) ("The attorney's fee provision of the PLRA only applies to fees authorized under § 1988.").

Although Plaintiffs have also advanced constitutional claims that otherwise could be subject to the PLRA rate cap, the work of Plaintiffs' counsel on the constitutional claims cannot be disaggregated from the claims under the ADA and Rehabilitation Act because the efforts were overlapping and complementary.  Accordingly, because Plaintiffs' work on their ADA and Rehabilitation Act claims are inextricably intertwined with their work on the constitutional claims, and therefore, the issues in the case for class and subclass members were so intertwined, the PLRA rate cap is inapplicable due to the impossibility of separating the work performed for rate-capped claims from that for non-rate capped claims.  *See Armstrong*, 318 F.3d at 974–75 (holding that the

---

[7]     42 U.S.C. § 1997e(d)(2).  The PLRA generally applies to cases brought by "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).  The PLRA caps the hourly rate for attorneys at 150% of the rate permitted under the Criminal Justice Act ("CJA Rate").  *Id*. § 1997e(d)(3).  For January 1, 2023 and after, the authorized CJA rate is $164 per hour, which translates to a maximum rate of $246 per hour under the PLRA (150% of $164).  *See* CJA Compensation Rates, U.S. Dist. Ct., N.D. Cal., https://www.cand.uscourts.gov/about/court-programs/criminal-justice-act-cja/cja-compensation-rates/ (last visited Dec. 1, 2023).  In 2022, the maximum PLRA rate was $237 per hour (150% of $158).

district court had discretion to award all fees at market rates in an ADA and Rehabilitation Act
case where a due process Section 1983 claim heavily overlapped with the ADA and Rehabilitation
Act claims).

Should the Court find that the capped and uncapped claims can be disaggregated, Plaintiffs
propose in the alternative that the Court divide the awarded fees into one-half at the Fitzpatrick
Matrix rates and one-half at the maximum PLRA-capped rate.

> b. **The Relevant Markets for Determining Counsel's Rates Are New York City
> and Washington, D.C.**

Because Plaintiffs' counsel's hourly rates are not capped by the PLRA, the proper hourly
rates are the prevailing market rates. *Binta B*., 710 F.3d at 627 ("Reasonable attorney's fees under
§ 1988 should be calculated according to the prevailing market rates in the relevant community.").
The general rule is that the "relevant community" for purposes of determining the reasonable
hourly rate for an attorney's services is "the venue of the court of record." *Geier v. Sundquist*,
372 F.3d 784, 791, 796-97 (6th Cir. 2004). A reasonable fee is one that is "sufficient to encourage
competent representation." *Gonter v. Hunt Valve Co*., 510 F.3d 610, 618 (6th Cir. 2007).

Here, however, the market rates in the Western District of Tennessee were not sufficient
to encourage competent representation. Prior to the filing of this case by the ACLU and Paul,
Weiss, along with local partners, no one had brought a case to protect the people in the Shelby
County Jail from COVID-19, despite the developing emergency. There are few qualified lawyers
in the Western District of Tennessee willing to take a case of this complexity and magnitude on
behalf of a class of incarcerated persons. Declaration of Robert L.J. Spence, Jr., dated January 19,
2024 ("Spence Decl.") ¶¶ 15, 20–21. Prisoner litigation is not considered prestigious; the private
bar is generally reluctant to deal with the special limitations imposed by the PLRA and the general
difficulty of litigating and prevailing in a prisoner rights case. Spence Decl. ¶ 22. At the time the

ACLU and Paul, Weiss agreed to sign on as counsel, this case had particular characteristics that made it especially undesirable even within this context. *See infra* Part II.B.10. (discussing "undesirability" *Johnson* factor); Spence Decl. ¶ 22; Fathi Decl. ¶ 22. Moreover, COVID-19 was new, not well understood, and frightening. Pre-litigation investigation, always challenging in a jail, was made more difficult by restrictions on visitation. Fathi Decl. ¶ 22. The likelihood of dismissal for failure to exhaust administrative remedies was high, as the situation was changing so quickly that people in the Jail had little ability to complete the grievance process. The ACLU and Paul, Weiss agreed to take this case because the ACLU Foundation of Tennessee, Just City, and other co-counsel lacked the resources to initiate and litigate this lawsuit on their own. (Fathi Decl. ¶ 8; Rockoff-Kirk Decl. ¶ 3.)

Accordingly, the relevant market for Plaintiffs' counsel is New York City and Washington, D.C., where the ACLU Foundation's and Paul, Weiss offices are located. The market rates in these cities for lawyers with experience equivalent to the national ACLU and Paul, Weiss lawyers and paralegals are set forth in the attached declarations of counsel. *See* Fathi Decl. ¶¶ 17–20 (establishing rates for New York City and D.C.-based ACLU staff); Rockoff-Kirk Decl. ¶¶ 23–24 (setting out Paul, Weiss's customary rates and comparable rates charged by a peer firm). The Fitzpatrick Matrix rates that Plaintiffs seek in this motion are well below the actual market rates to which they would be entitled in New York and Washington. Fathi Decl. ¶ 19, Rockoff-Kirk Decl. ¶ 25.

Further, Plaintiffs' requested rates are reasonable even if the Court determines that the Western District of Tennessee is the applicable rate-setting market and applies an enhancement. Memphis civil rights attorney Robert Spence attests to Western District of Tennessee market rates for class counsel and that Plaintiffs' requested rates are reasonable. Spence Decl. ¶¶ 12, 20, 24.

18

Accordingly, whether allowing the application of the Fitzpatrick Matrix rates or looking solely to local market rates, Plaintiffs' requested rates are reasonable.

**B.    The *Johnson* Factors Support an Award of the Full Lodestar**.

In calculating the "lodestar"—the number of hours reasonably expended multiplied by a reasonable hourly rate—courts consider the 12 factors enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); s*ee Isabel v. City of Memphis*, 404 F.3d 404, 415–16 (6th Cir. 2005) (citing *Reed v. Rhodes*, 179 F.3d 453, 471–72 n.3 (6th Cir. 1999)).

The *Johnson* factors are as follows:  (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases."  *Isabel*, 404 F.3d at 415–16.  The "'most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"  *Id*.  (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) and *Hensley*, 461 U.S. at 436).

Plaintiffs do not request an upward adjustment of the lodestar but submit that a downward departure from the lodestar would be unjustified under the *Johnson* analysis, based on Plaintiffs' counsel's successful work enforcing their clients' rights in this complex and difficult case.

**1.    The Time and Labor Required**.

In assessing the time and labor required, "[t]he trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities."  *Johnson*, 488 F.2d at 717.

Plaintiffs staffed the case efficiently to carry out the numerous tasks associated with investigating and initiating the case, preparing motions, engaging in real time communications with Class Members about conditions and practices in the Jail, negotiating and obtaining approval of the Settlement, and pursuing enforcement work to make Plaintiffs' entitlements under the Consent Decree a reality.  (Fathi Decl. ¶¶ 14–16.)  Lead counsel from the various offices carefully considered the necessary staffing of this case and selected to the best of their ability the most efficient possible litigation team.  (Fathi Decl. ¶ 14.)  The efficient staffing of this case allowed Class Counsel to carry out their factual investigation as well as their monitoring of conditions and enforcing compliance with the Consent Decree at the lowest cost.  (Fathi Decl. ¶ 16.)

Plaintiffs also properly distinguished between legal work and clerical work.  Class Counsel has reviewed their time entries, no-charged all work that was arguably clerical, and no-charged time spent by lawyers, law students, summer associates, and legal fellows that was arguably non-legal work that could have been performed by a non-lawyer.  (Fathi Decl. ¶ 12; Rockoff-Kirk Decl. ¶ 22.)

### 2.    The Novelty and Difficulty of the Questions.

For purposes of determining fees, courts presume that civil rights cases are as complex as equally complex federal litigation.  *See Blum v. Stenson*, 465 U.S. 886, 893 (1984); *Hensley*, 461 U.S. at 430 n.4, 447.

The issues addressed in this case were indeed complex.  The Complaint alleged systemic failures by Shelby County and Defendants to provide minimally adequate protections from COVID-19 in a large, crowded Jail environment.  The pandemic represented a new and ongoing threat to the health of detained persons, and Plaintiffs' counsel are unaware of any civil rights cases asserting a constitutional right to protection from this particular virus that had ever been brought before March 2020.  The questions presented in the case, therefore, were novel.  As *Johnson*

explains, "[c]ases of first impression generally require more time and effort" and counsel "should not be penalized for undertaking a case which may 'make new law.'  Instead [counsel] should be appropriately compensated for accepting [this] challenge." *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974).

The size of the Jail compounded the complexity and difficulty of this litigation.  The lawsuit alleged dangerous conditions and substandard practices in multiple aspects of the Jail's operations that contribute to an unreasonable risk of COVID-19 infection of detainees.  The conditions span the booking process for newly admitted detained persons, the housing of detained persons to reduce their risk of either transmitting or being infected with COVID-19, staff practices that increase the risk of transmission, provision of medical services, movement of detained persons, and the procedures in the event of a known or suspected case of COVID-19 infection.  During the period covered by the pending fees motion, the Jail held more than 2,000 people on any given day. (Fathi Decl. ¶ 16.)

**3.    The Skills Requisite to Perform the Legal Service Properly**.

In assessing the skills required to perform the legal services rendered, "[t]he trial judge should closely observe the attorney's work product, his preparation, and general ability before the court.  The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson*, 488 F.2d at 718.

This complex case required skilled lawyers with specialized knowledge of prison and jail litigation and complex class actions.  Plaintiffs' attorneys met this standard, demonstrating their skills in written briefs, oral advocacy, presentation of witnesses, investigations, and the successful negotiations that led to the Consent Decree.  (Fathi Decl. ¶¶ 3–4; Rockoff-Kirk Dec. ¶¶ 8, 10.)

21

**4.    The Preclusion of Other Employment Due to Accepting the Case**.

The fourth *Johnson* factor "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson*, 488 F.2d at 718.

The ACLU's and Paul, Weiss's decision to take this case affected their ability to take on other matters.  The ACLU offices and Paul, Weiss had to devote a significant amount of time to initiating this lawsuit, preparing and filing emergency motions, engaging in intensive negotiations to resolve this case, and then monitoring compliance and enforcement efforts.  The ACLU and Paul, Weiss could not devote this time to other matters or potential new cases.  (Fathi Decl. ¶ 9; Rockoff-Kirk Decl. ¶ 26.)

**5.    The Customary Fee**.

*Johnson* directs that "[t]he customary fee for similar work in the community should be considered." *Johnson*, 488 F.2d at 718.  As set forth above, the rates claimed are significantly below the market rates applicable to Plaintiffs' counsel and are not significantly higher than the market rates for attorneys in the Western District of Tennessee.  *See supra* Part II.A.2.b.

**6.    Whether the Fee Is Fixed or Contingent**.

*Johnson* directs that "[t]he fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectations when he accepted the case." *Johnson*, 488 F.2d at 718.

Here, Plaintiffs' counsel charged their clients neither a fixed nor contingent rate but  agreed to represent the class in a civil rights case *pro bono*, expecting to receive fees if they prevailed via a court-enforceable decree.  (Fathi Decl. ¶ 8.)  Having done so, Plaintiffs' counsel reasonably expect to receive their lodestar fees for enforcement work, as allowed by the Consent Decree.  *See*

*Adcock–Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349–50 (6th Cir. 2000) (quoting *Hensley*, 461 U.S. at 435) ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.").

### 7.    Time Limitations Imposed by the Client or the Circumstances.

*Johnson* directs that "[p]riority work that delays the lawyer's other legal work is entitled to some premium." *Johnson*, 488 F.2d at 718.  The emergency nature of the COVID-19 pandemic and the particular peril in which the virus placed incarcerated people required prioritizing this work.  Lives were literally at risk, necessitating Plaintiffs' counsel putting this action ahead of many other cases.  Indeed, this Court has already recognized the "unprecedented crisis in need of urgent resolution" that gave rise to this litigation.  (ECF No. 162 at 7.)  This factor is also discussed above under Factor 4, "Preclusion of Other Employment."  *See supra* Part II.B.4.

### 8.    The Amount Involved and the Results Obtained.

As stated above, the eighth *Johnson* factor—the results obtained—is the most critical consideration.  *Isabel*, 404 F.3d at 415–16.  "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Adcock–Ladd*, 227 F.3d at 349–50; *see also Disabled Patriots of Am., Inc.* v. *Rsrv. Hotel, Ltd.*, 659 F. Supp. 2d 877, 886 (N.D. Ohio 2009).  The consideration of the results obtained includes injunctive relief as well as damages.  *See Geier* v. *Sundquist*, 372 F.3d 784, 795 (6th Cir. 2004).  In *Geier*, the Sixth Circuit considered the injunctive relief obtained by Plaintiffs, found that the results obtained were "exceptional," and remanded the case to the district court to determine if, considering all factors including the results obtained, an upward departure from the lodestar was warranted.  *Id*. At 795–96.

This factor supports an award of the lodestar (at the reduced market rates Plaintiffs seek).  The enforcement work in this case benefits thousands of people who pass through the gates of the Shelby County Jail yearly.  During the period covered by the pending fees motion, the Jail held

more than 2,000 people per day.[8]  Because of counsel's work, Plaintiffs were able to reach a comprehensive settlement that required Defendants to improve COVID-19 detection, investigation, mitigation, and treatment programs in the Jail, including improving efforts to expedite releases.  (*See* ECF No. 161-2.)  The Consent Decree required improvements to multiple aspects of the Jail's operations and procedures, which were the same conditions and practices Plaintiffs raised in the Complaint.  (ECF No. 1.)  Class Counsel's work resulted in a comprehensive Consent Decree that led to the identification and remediation of COVID-19 hazards that plagued the Jail.  The Court found that the relief in the Consent Decree "addresse[d] most if not all, of Plaintiffs' alleged deficiencies in their confinement in the Jail . . . and the Court is not aware of any greater successes in similar litigation."  (ECF No. 162 at 6.)

However, the words in the Consent Decree would have remained just words without Plaintiffs' counsel's efforts to enforce Consent Decree.  The day after the Consent Decree was approved, Defendants declared the case over, stating that they were about to take their "final action" to comply with the Decree—a single round of administration of a COVID-19 vaccine on a single day to detainees had who requested it.  (ECF No. 216-3.)  Through Plaintiffs' counsel's litigation, negotiation, and enforcement efforts and work with the Independent Inspector, Defendants ultimately:

      1.      Improved access to COVID-19 testing;

      2.      Provided access to vaccines;

      3.      Provided ongoing education about the vaccines;

---

[8]     *See* Jail & Inmate Information, SHELBY COUNTY SHERIFF'S OFFICE (last visited Dec. 4, 2023), https://www.shelby-sheriff.org/jail-inmate-information ("The average daily census for the two facilities for men and women is approximately 2,000 inmates."); *see also* Fathi Decl., Ex. C (Email from Defendants' counsel with Jail report) (reporting 2,105 detainees as of September 5, 2023).

24

4.    Provided incentives for detained people to take the vaccines;

5.    Provided masks;

6.    Improved isolation practices;

7.    Improved the Court Expeditor office's efforts to evaluate detainees for release and documentation of their advocacy work; and

8.    Extended the life of the Decree and the Independent Inspector's involvement.

(*See* ECF Nos. 316, 345, 359.)[9]  Defendants' obligation to take these protective measures continued for more than two years as Plaintiffs successfully fought Defendants' motion to terminate and sought and obtained relief enforcing and extending the Consent Decree.  Because of Plaintiffs' counsel's efforts, the words of the Consent Decree became reality, giving substantial protection to the class members.

**9.    The Experience, Reputation, and Ability of the Attorneys**.

The ninth *Johnson* factor acknowledges that

> [m]ost fee scales reflect an experience differential with the more experienced attorneys receiving larger compensation. An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience. Longevity per se, however, should not dictate the higher fee. If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar.

*Johnson*, 488 F.2d at 719–20.

As detailed above, Class Counsel possess significant skills and experience in complex civil

---

[9]    Even on the portions of the enforcement motion not granted, the Court was clear that Defendants had continued obligations under the Decree:  "The Court's decision to deny enforcement on certain issues does not release Defendants from the Consent Decree's requirements.  Rather, this ruling simply reflects the current state of Defendants' implementation efforts, which must continue as required in the Consent Decree."  (ECF No. 316 at 22.)

rights and class action litigation, and their market rates reflect their experience, reputation, and qualifications. *See supra* Part II(B)(3), (5) (discussing *Johnson* factors of skill requisite to perform the legal services properly and the customary fee); *see also* Fathi Decl. ¶¶ 4, 14; Spence Decl. ¶ 16–17, 22; Rockoff-Kirk Decl. ¶¶ 8, 10. The ACLU has litigated complex class actions on behalf of incarcerated people for over half a century. (Fathi Decl. ¶ 3.) Nancy Rosenbloom, who led the litigation team through much of the enforcement period, has decades of experience litigating complex civil rights class actions, including on behalf of incarcerated people. (Fathi Decl. ¶ 15.) Paul, Weiss's attorneys have, combined, decades of experience representing a diverse range of clients including in complex jail litigation and class actions. (Rockoff-Kirk Decl. ¶¶ 8, 10.)

### 10.    The "Undesirability" of the Case.

*Johnson* recognizes that "[c]ivil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant . . . Oftentimes [their] decision to help eradicate discrimination is not pleasantly received by the community or [their] contemporaries." *Johnson*, 488 F.2d at 719 (citations omitted).

Class action cases on behalf of incarcerated people are generally considered "undesirable" even by the civil rights bar, in part because they are so time consuming and expensive to litigate. *See Graves* v. *Arpaio*, 633 F. Supp. 2d 834, 847 (D. Ariz. 2009) ("This case is considered 'undesirable' because § 1983 class actions on behalf of [detainees] involving the conditions of confinement are exceedingly fact-intensive, time-consuming, and expensive to litigate.").

A stigma is associated with prison conditions litigation. *See Alberti v. Klevenhagen*, 903 F.2d 352 (5th Cir. 1990) (*per curiam*) (affirming a lodestar "undesirability enhancement" of the hourly rate as necessary "to attract competent counsel to take on . . . undesirable prison conditions litigation"); *Ruiz v. Estelle*, 553 F. Supp. 567, 593 (S.D. Tex. 1982) (noting "it is undisputed that litigation involving [detainees'] rights is seldom actively sought, nor is it prestigious in traditional

legal circles"); *Martino v. Carey*, 568 F. Supp. 848, 851 (D. Or. 1983) (recognizing that "[a]lthough one might expect that society would accord a very high status to persons who undertake the defense of the constitutional rights of others, this is not the case in prison litigation" and "[p]ublic hostility can be a significant factor in deterring representation in these cases"); *Morales Feliciano v. Hernandez Colon*, 697 F. Supp. 51, 60 (D.P.R. 1988) (noting "Plaintiffs' representation [was] undesirable because [the detainees'] cause [was] unpopular" and "repudiated" in the community); *Gillespie v. Brewer*, 602 F. Supp. 218, 229–30 (N.D.W. Va. 1985) (increasing the lodestar by 20% based on undesirability after noting "[r]epresenting a prisoner in a Section 1983 action against law enforcement officials is a difficult and unpleasant task due to the nature of the issues involved, the limited access provided to the client/prisoner and the unlikelihood of ultimate success"); *Barnard v. Piedmont Reg'l Jail Auth.*, No. CIV.A. 3:07CV566, 2009 WL 3416228, at *2 n.4 (E.D. Va. Oct. 21, 2009) (noting the "undesirability of prisoner litigation in general"); *El-Tabech v. Clarke*, No. 4:04CV3231, 2008 WL 1995304, at *3 (D. Neb. May 5, 2008) (recognizing that "prisoner litigation cases are often regarded as undesirable").

The nature of this case itself made it highly undesirable and difficult to monitor compliance. Class action cases on behalf of detained persons are very time consuming and expensive to litigate. Development of the facts is particularly difficult because access to clients and witnesses in detention is so limited, usually requiring—as in this case—many phone and video calls to jail facilities to conduct interviews in challenging and stressful conditions. Ultimate success is unlikely in most cases, even the most meritorious, because of the limitations imposed by the PLRA and the built-in disadvantage of pitting the credibility of detained persons against that of prison officials and staff. (Spence Decl. ¶ 22; Fathi Decl. ¶ 21.)

Plaintiffs' case—a class action involving multiple complex factual and legal issues—

presented obvious difficulty, where it was plain that trial preparation would be enormously labor-intensive and time consuming, and a very heavy outlay of money for fees and expenses for multiple experts would be required.  Though the Defendant Sheriff and County were equipped with their own legal department, they also retained experienced private counsel to vigorously contest the claims.  Because the case would likely involve a lengthy trial with multiple jailed witnesses, it was the kind of case that would be particularly unappealing to the local bar.  (Spence Decl. ¶ 22.)  In addition, these issues were compounded by the risks and difficulties in litigating this case during a global pandemic, which put at risk any of Class Counsel or staff who entered the Jail for the purpose of factual development.

There were also significant practical challenges that made litigating this case undesirable. The Jail is a high intake and high turnover facility by its nature as a pre-trial facility, making the collection of evidence over periods of time highly challenging.  Counsel had to initiate an investigation at a time during which their own offices were closed, without on-site access to either the prisoners or facilities.  As the case continued, access to class members continued to be limited by virtue of their status as incarcerated people and the many quarantines and other restrictions necessitated by the pandemic.  These are exceptional circumstances brought on by the COVID-19 pandemic that made investigating and litigating this case exceptionally difficult.  (Fathi Decl. ¶ 22.)

## 11. The Nature and Length of the Professional Relationship with the Client.

The eleventh *Johnson* factor considers the nature and length of the attorney-client relationship, recognizing that "[a] lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office.  The Court may appropriately consider this factor in determining the amount that would be reasonable."  *Johnson*, 488 F.2d at

719.  The ACLU offices' and Paul, Weiss's professional relationship with individual Plaintiffs and the Plaintiff class began more than three years ago, and has continued uninterrupted since that time.  (Rockoff-Kirk Decl. ¶ 3.)

12.   **Awards in Similar Cases**.

*Johnson* directs that "[t]he reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit."  *Johnson*, 488 F.2d at 719.  It is difficult (if not impossible) to identify cases for comparison with identical fact patterns, procedural histories, or time necessary to obtain relief.  Nevertheless, the lodestar and requested rate in this case are eminently reasonable in relation to comparable cases.

In *Howard v. Tennessee*, No. 3:16-CV-2829, 2018 WL 10151080, at *4 (M.D. Tenn. Dec. 14, 2018), a voter registration litigation in this district, the court granted fees for up to $600 an hour for partner-level attorneys, awarding a total of $14,406.73 in fees and costs.  *Id.* At *5.  In *Bongo Prods., LLC v. Lawrence*, No. 3:21-cv-00490 (M.D. Tenn. Jun. 25, 2021), a First Amendment and LGBTQ+ rights litigation, the court awarded attorneys' fees as high as $475 an hour for ACLU attorneys.  (Yarbrough Decl. Ex. A, Ex. B at PageID #1197.)  And in *Tenn. State Conf. of the NAACP* v. *Hargett*, No. 3:19-cv-00365 (M.D. Tenn. May 2, 2019), the court granted rates as high as $500 an hour for private law firm attorneys.  (Yarbrough Decl. Ex. C, Ex. D at 22.)  Given the rates granted in this district and the complex and long-running nature of this class action litigation and enforcement, Plaintiffs' request compares favorably.  (Spence Decl. at ¶¶ 12–14, 23–24.)

In prison conditions litigation, specifically, in *Prison Legal News* v. *Inch*, 411 F. Supp. 3d 1198, 1206 (N.D. Fla. 2019), a Section 1983 case, the court awarded attorneys' fees as high as $900 per hour, finding them to be consistent with Miami market rates.  The court considered the "excellent reputations and abilities" of the senior attorneys as well as precedent from the Southern

District of Florida in finding the sought fees reasonable. *Id*. At 1208 (collecting cases). In total, the court awarded $1,148,210.89 in attorneys' fees and $33,448.57 in expenses. *Id*. at 1204–05.

Plaintiffs' fee request here compares favorably even to cases in which the PLRA rate cap applied in full. In *Graves v. Arpaio*, a case from 2008, incarcerated plaintiffs successfully defeated a motion to terminate a judgment involving conditions of confinement, although some provisions of the judgment were terminated. 633 F. Supp. 2d 834 (D. Ariz. 2009). Because of plaintiffs' enforcement efforts in *Graves*, the Court issued an amended, enforceable judgment. *Id*. at 841. The Court awarded attorneys' fees in the amount of $1,239,491.63. *Id.* at 856 (Plaintiffs' applications for attorneys' fees were based on the PLRA-capped hourly rate for the applicable time periods of $169.50 and $177.00 (*id.* at 854–855; *see also* ECF Nos. 1747, 1826, attached as Ex. E to Fathi Declaration, Fathi Decl. ¶ 20)). This fee award did not include fees associated with subsequently defending the district court's amended judgment on appeal. *See Graves*, 623 F.3d 1043.

In *Scott v. Clarke,* a civil rights class action case challenging health care deficiencies at a women's prison in Virginia, plaintiffs negotiated a favorable settlement with the state without a trial. The Court awarded a negotiated fee award of $1,500,000.00. *See* 2016 WL 452164, at *18 (W.D. Va. Feb. 5, 2016) (Plaintiffs' fee application had sought attorneys' fee at the then PLRA-capped rate of $211.50 per hour).

30

## CONCLUSION

Plaintiffs ask the Court to award them the full lodestar amount in this case, with market rates adjusted downward to the Fitzpatrick Matrix rates, in the amount of $769,337.80. If the Court finds that the PLRA rate-capped and uncapped claims can be separated for the purpose of this motion, then Plaintiffs request half of the award be at market rates and half at the 2022 PLRA-capped rate of $237 per hour. Plaintiffs also request interest from the date of judgment.

Dated: January 24, 2024

Respectfully submitted,

/s/ *Nancy Rosenbloom*

Nancy Rosenbloom
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
nrosenbloom@aclu.org

Brice M. Timmons (Bar No. 29582)
Donati Law Firm
1475 Union Avenue
Memphis, TN 38104
Telephone: (901) 762-0535
Facsimile: (901) 762-0527
btimmons@donatilaw.com

Josh Spickler (Bar No. 021019)
Wesley Dozier (Bar No. 037735)
Just City
P.O. Box 41852
Memphis, TN 38174
Telephone: (901) 206-2226
josh@justcity.org

Maria Morris
American Civil Liberties Union
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6607
mmorris@aclu.org

Zoe Brennan-Krohn
American Civil Liberties Union
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0769
zbrennan-krohn@aclu.org

Stella Yarbrough (Bar No. 33637)
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Telephone: (615) 320-7142
syarbrough@aclu-tn.org

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Joseph Bial
2001 K Street NW
Washington, D.C. 20006-1047
Telephone: (202) 223-7300
Fascimile: (202) 223-7420
jbial@paulweiss.com

Ariane Rockoff-Kirk
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Fascimile: (212) 757-3990
arockoff-kirk@paulweiss.com

*Attorneys for Plaintiffs and Plaintiff Class*